**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Wayne MAXWELL; Keith Woods;**
**Brenda Faye Johnson, Defen-**
**dants–Appellants.**

**No. 92–6349.**

United States Court of Appeals,
Eleventh Circuit.

Oct. 7, 1994.

Wesley Blacksher, Mobile, AL, for Keith Woods.

J.B. Sessions, III, U.S. Atty., Richard H. Loftin, Mobile, AL, for U.S.

Before BIRCH, Circuit Judge, CLARK, Senior Circuit Judge, and HOEVELER *, Senior District Judge.

CLARK, Senior Circuit Judge:

Defendants-appellants Wayne Maxwell, Keith Woods, and Brenda Faye Johnson challenge their convictions and sentences on charges of conspiring to distribute and distributing controlled substances. We affirm the convictions of all three defendants and the sentences of Woods and Johnson. Because we find that the district court erred in calculating Maxwell's guidelines range, we vacate his sentence and remand for resentencing.

## FACTS

Defendants Maxwell, Woods, and Johnson were indicted along with Edward Hall Yates and Elijah Smith, Johnson's common law husband, for conspiring to distribute and to possess with intent to distribute hydromorphone hydrochloride, a narcotic also known as dilaudid, in violation of 21 U.S.C. §§ 841(a)(1) and 846. The indictment alleged that the conspiracy began in the middle of 1986 and continued through June of 1991. In addition to the conspiracy count, Maxwell and Woods were also charged with several substantive counts of distributing dilaudid during the period of the conspiracy. Maxwell was also charged with one count of distributing less than one ounce of cocaine in April or May of 1987. Yates and Smith entered pleas of guilty, and their convictions and sentences are not at issue in this appeal. Maxwell, Woods, and Johnson were tried together before a jury.

The government's principal witness was Richard Lundy. Lundy had been convicted

Neil Hanley, Mobile, AL, for Wayne Maxwell.

Margaret A. Stone, Mobile, AL, for Brenda Faye Johnson.

* Honorable William M. Hoeveler, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

of conspiring to distribute dilaudid and had agreed to cooperate with the government in exchange for a lesser sentence. Lundy testified as follows. From 1986 until June of 1991, he had been in the business of distributing dilaudid. He had two sources of supply for dilaudid pills: Maxwell and Yates.[1] Lundy would purchase dilaudid pills from Maxwell and then sell them to Woods, Smith, and Johnson, who would then sell them to others.[2] Lundy had supplied Woods with dilaudid pills from 1986 until 1991; Woods usually sold these pills at a convenience store near Lundy's house.[3] In June of 1988, Lundy had begun selling dilaudid to Johnson, who would purchase dilaudid pills for a few other people so that she could make a sufficient profit to purchase a pill for herself.[4] Because Lundy had preferred dealing with Johnson's common law husband, Smith, rather than with Johnson, Lundy eventually began selling dilaudid to Smith rather than Johnson. Even after Lundy began dealing with Smith, Johnson had continued to participate in the sale of dilaudid with her husband. When Smith was busy, Johnson would obtain the dilaudid pills from Lundy or deliver money from dilaudid sales to Lundy.[5]

Lundy testified that he had purchased cocaine from Maxwell in April or May of 1987. Lundy had collected money from a number of people so that he could purchase dilaudid for them. When he was unable to obtain dilaudid, Lundy had obtained, instead, less than an ounce of cocaine from Maxwell. This is the only occasion on which Lundy purchased cocaine from Maxwell.[6] Maxwell did not ever ask Lundy to become involved in cocaine distribution.[7]

The government offered the testimony of several other witnesses to bolster Lundy's account of the involvement of Maxwell, Woods, and Johnson in the dilaudid distribution scheme. Lundy's wife testified that she occasionally had obtained dilaudid from Maxwell on her husband's instructions and that Maxwell had come by their house to collect money from her husband.[8] She also testified that she had delivered dilaudid pills to Smith and to Woods on her husband's instructions.[9] Four other witnesses testified that they had purchased dilaudid from Woods,[10] and one witness testified that she had purchased dilaudid from Johnson.[11] The officer who took statements from Woods and Johnson shortly after their arrest testified that Woods had admitted to delivering dilaudid pills and collecting money for Lundy and that Johnson had admitted that she and her husband distributed the dilaudid they obtained from Lundy to support their own drug habits.[12] Finally, two witnesses corroborated Lundy's testimony regarding the substitution of cocaine for dilaudid in April or May of 1987.[13]

In addition to testimony regarding the charges of the indictment, the government, over Maxwell's objections, also introduced extrinsic offense evidence regarding other drug dealings in which Maxwell had allegedly been involved. First, Lundy testified that he and Maxwell had made two trips to Kansas in the fall of 1990 to obtain marijuana.[14] A city police officer, with whom Lundy had been cooperating at the time, corroborated this testimony.[15] Second, Shirley Goneke

---

1. R5–72–73; R5–104–105.

2. R5–92.

3. R5–94–98.

4. R5–100–102; R5–147–148; R5–169.

5. R5–100–102; R5–169–170.

6. R5–78–80.

7. R5–86.

8. Testimony of Valerie Lundy, R5–213–220.

9. *Id.*, R5–220–223.

10. Testimony of Jimmy Faircloth, R6–298–299; testimony of Vonnie Broadus, R6–319–320; testimony of Theresa Estes, R6–373–375; testimony of Cheryl Etheridge, R6–427–428.

11. Testimony of Lee Ann Thompson, R6–289.

12. Testimony of John Pigott, R6–441–442; R6–445–446.

13. Testimony of Jimmy Faircloth, R6–300–302; testimony of Vonnie Broadus, R6–315–317.

14. R5–87–91.

15. Testimony of Eddie Carr, R6–408–410.

testified that she had purchased two dilaudid pills from Maxwell in 1984 or 1985, prior to the period of the conspiracy charged in the indictment.[16] Third, Jerry Dycus testified that, beginning in April of 1986, he had sold cocaine for Maxwell for a period of a month and a half to two months.[17] According to Dycus, he never discussed dilaudid with Maxwell [18] and never had any dealings with those involved in the dilaudid distribution; the 1986 cocaine deals were solely between him and Maxwell.[19] Finally, after Maxwell took the stand and denied ever supplying anyone with cocaine or crack cocaine,[20] the government on rebuttal called Rolin Manders, who testified that he had purchased crack cocaine from Maxwell on several occasions.[21] During the charge to the jury, the district court instructed that this extrinsic offense evidence could not be used to establish that Maxwell committed the acts charged in the indictment, but could only be used to establish his state of mind.[22]

The jury found all three defendants guilty of conspiracy to distribute dilaudid. Maxwell was also convicted of distributing less than an ounce of cocaine in April or May of 1987, and Woods was convicted on several substantive charges of distribution of dilaudid. Maxwell was sentenced to 136 months in prison, Woods was sentenced to 30 months in prison, and Johnson was sentenced to 21 months in prison. All three defendants appealed.

## DISCUSSION

### The Convictions

Maxwell contends that the district court erred in permitting the government to introduce the extrinsic offense evidence. Specifically, he challenges the introduction of evidence regarding his trips to Kansas to obtain marijuana, his sale of dilaudid to Goneke in 1984 or 1985, his sale of cocaine to Dycus in 1986, and his sale of crack cocaine to Manders. The district court held that this evidence of uncharged drug offenses was admissible under Fed.R.Evid. 404(b) as relevant to Maxwell's intent to distribute controlled substances.

Extrinsic evidence of uncharged bad acts is admissible if the evidence is relevant to an issue other than the defendant's character, the probative value of the evidence substantially outweighs its undue prejudice, and the government offers sufficient proof that the jury could find that the defendant committed the acts.[23] Here, the government introduced the extrinsic offense evidence to prove intent, which Maxwell placed at issue by pleading not guilty to the charges against him.[24] This court has said that "'[e]vidance of prior drug dealings is highly probative of intent to distribute a controlled substance, as well as involvement in a conspiracy.'"[25] This court also has observed that "the precedents in this circuit allowing evidence of prior drug-dealing offenses in drug conspiracy prosecutions are ample."[26] The district court's rulings in this case are consistent with these precedents. Accordingly, after careful consideration of the record and the binding caselaw, we conclude that the district court's admission of the extrinsic offense evidence does not constitute reversible error.

Woods and Johnson contend that the evidence is insufficient to support their con-

**16.** R6–346–347. Although the district court admitted Goneke's testimony regarding the dilaudid purchase, the court excluded her testimony regarding Maxwell's dealings in cocaine and marijuana, finding that the prejudice resulting from such testimony would outweigh its probative value. R6–341; R6–351–352.

**17.** R5–191–197.

**18.** R5–201.

**19.** R5–204–206.

**20.** R7–613–614.

**21.** R8–750–751.

**22.** R8–856.

**23.** *United States v. Stubbs*, 944 F.2d 828, 836 (11th Cir.1991).

**24.** *United States v. Jones*, 913 F.2d 1552, 1566 (11th Cir.1990).

**25.** *Stubbs*, 944 F.2d at 836 (quoting *United States v. Hitsman*, 604 F.2d 443, 448 (5th Cir.1979)).

**26.** *United States v. Pollock*, 926 F.2d 1044, 1049 (11th Cir.) (*see* cases cited therein), *cert. denied,* — U.S. ——, 112 S.Ct. 593, 116 L.Ed.2d 617 (1991).

victions. We must decide whether the evidence, viewed in the light most favorable to the government, establishes Woods' and Johnson's guilt beyond a reasonable doubt.[27] As to Woods, Lundy testified that he sold dilaudid to Woods and that Woods sold it to others at a convenience store near Lundy's house, Lundy's wife testified that she delivered dilaudid to Woods, and four witnesses testified that they purchased dilaudid from Woods. As to Johnson, Lundy testified that Johnson purchased dilaudid for others to support her own drug habit and that, after he began dealing with Johnson's husband, Johnson would sometimes obtain dilaudid from Lundy or deliver money to Lundy for her husband. One witness testified that she purchased dilaudid from Johnson. Both Woods and Johnson made inculpatory statements to police following their arrests. Having carefully reviewed the record, we are convinced that the evidence is sufficient to support the convictions of both Woods and Johnson.

### The Sentences

Maxwell raises two challenges to the district court's calculation of his sentencing guidelines range. First, Maxwell argues that the district court erred in determining the amount of drugs attributable to him for purposes of calculating his base offense level. Had the district court held Maxwell accountable only for the distribution of dilaudid and of less than one ounce of cocaine, as charged in the indictment, Maxwell's base offense level would have been 18.[28] Relying on extrin-

sic offense evidence, specifically, Dycus' trial testimony that he had sold cocaine for Maxwell in the spring of 1986, the district court found that Maxwell had distributed an additional 546 grams of cocaine with which he was not charged. The district court then included the distribution of this additional 546 grams of cocaine as "relevant conduct" under U.S.S.G. § 1B1.3; this resulted in an increase in Maxwell's base offense level from 18 to 26.[29] Maxwell contends this was error.

U.S.S.G. § 1B1.3(a)(2) sets out what "relevant conduct" must be considered in calculating a defendant's base offense level. It provides that the defendant must be held accountable for all acts and omissions "that were part of the same course of conduct or common scheme or plan as the offense of conviction." The commentary following § 1B1.3 makes clear that relevant conduct may include uncharged conduct:

> "Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range.... [I]n a drug distribution case, quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction." [30]

The commentary also makes clear that § 1B1.3 is designed to take account of "a pattern of misconduct that cannot readily be broken into discrete, identifiable units that are meaningful for purposes of sentencing." [31] Thus, "when illegal conduct does exist in 'discrete, identifiable units' apart

---

27. *United States v. Davis*, 902 F.2d 860, 867 (11th Cir.1990).

28. Maxwell's Presentence Report at ¶¶ 13 and 23; U.S.S.G. § 2D1.1(c)(13).

29. R10–27; Maxwell's Presentence Report at ¶¶ 15 and 23; U.S.S.G. § 2D1.1(c)(9). The district court also included as relevant conduct the extrinsic marijuana offense about which Lundy testified and the extrinsic crack cocaine offense about which Manders testified. R10–27; Maxwell's Presentence Report at ¶¶ 16, 18, and 23. These two extrinsic offenses did not affect Max-

well's base offense level; that is, his base offense level remained 18 regardless of whether he was held accountable for the drugs involved in the extrinsic marijuana and crack cocaine offenses. *See* Maxwell's Presentence Report at ¶ 23; U.S.S.G. § 2D1.1(c)(13). It is the extrinsic cocaine offense about which Dycus testified that resulted in an eight-point increase in Maxwell's base offense level. Thus, we will limit our discussion to this latter extrinsic offense.

30. U.S.S.G. § 1B1.3, comment. (backg'd.).

31. *Id.*

from the offense of conviction, the Guidelines anticipate a separate charge for such conduct." [32]

Other circuits have held that, in evaluating relevant conduct for purposes of § 1B1.3, a court must look to the "similarity, regularity, and temporal proximity" between the offense of conviction and the uncharged conduct.[33] Although this circuit has not specifically so held, our cases are in accord with such a holding.[34] Accordingly, we will evaluate the "similarity, regularity, and temporal proximity" between Maxwell's counts of conviction and the extrinsic cocaine offense about which Dycus testified. As the Seventh Circuit has said, we must consider "whether there are distinctive similarities between the offense of conviction and the remote conduct that signal that they are part of a single course of conduct rather than isolated, unrelated events that happen only to be similar in kind." [35] We will reverse only if we find that the district court "clearly erred in considering as 'part of the same course of conduct or part of a common scheme or plan as the count of conviction' conduct which exists in 'discrete, identifiable units' apart from the offense of conviction." [36]

■ Maxwell was convicted of conspiring to distribute dilaudid and of making a single sale of cocaine to Lundy. The single cocaine sale was directly related to the dilaudid distribution, as Lundy purchased the cocaine as a substitute for dilaudid. Thus, Maxwell's counts of conviction involve a dilaudid distribution scheme. The extrinsic offense, on the other hand, involved a cocaine distribution scheme. Other than Maxwell, the dilaudid distribution scheme and the cocaine distribution scheme did not involve *any* of the same parties. The dilaudid distribution scheme involved Maxwell, Lundy, and those to whom Lundy sold dilaudid; the cocaine distribution scheme involved only Maxwell and Dycus. Lundy testified that Maxwell never asked him to become involved in cocaine distribution, and Dycus testified that he and Maxwell never discussed dilaudid and that he never had any dealings with any of those involved in the dilaudid distribution. Dycus' sale of cocaine for Maxwell occurred more than a year before Maxwell's single sale of cocaine to Lundy; thus, these acts are temporally remote. Having carefully reviewed the record, we cannot say that there are any "distinctive similarities" between the dilaudid distribution scheme and the cocaine distribution scheme that "signal that they are part of a single course of conduct." [37] Rather, the two offenses appear to be "isolated, unrelated events that happen only to be similar in kind." [38] We do not think that two offenses constitute a single course of conduct simply because they both involve drug distribution. To so conclude would be, in the words of the Fourth Circuit,

> to describe [the defendant's] conduct at such a level of generality as to eviscerate the evaluation of whether uncharged criminal activity is part of the 'same course of conduct or common scheme or plan' as the offense of conviction. With a brushstroke that broad, almost any uncharged criminal activity can be painted as similar in at least one respect to the charged criminal conduct.[39]

---

**32.** *United States v. Hahn*, 960 F.2d 903, 909 (9th Cir.1992); *see also United States v. Sykes*, 7 F.3d 1331, 1335 (7th Cir.1993); *United States v. Mullins*, 971 F.2d 1138, 1143 (4th Cir.1992).

**33.** *Sykes*, 7 F.3d at 1336; *United States v. Chatman*, 982 F.2d 292, 294 (8th Cir.1992); *United States v. Bethley*, 973 F.2d 396, 401 (5th Cir. 1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1323, 122 L.Ed.2d 709 (1993); *Mullins*, 971 F.2d at 1144; *Hahn*, 960 F.2d at 910.

**34.** *See United States v. Rodgers*, 951 F.2d 1220, 1223 (11th Cir.1992) (offense of conviction and other offenses part of same course of conduct where they "occurred closely related in time and seemed to involve some of the same parties"), *amended*, 972 F.2d 1253 (11th Cir.1992); *United*

*States v. Query*, 928 F.2d 383, 385 (11th Cir. 1991) (state court drug case was relevant conduct for sentencing in federal drug case where "the drugs seized in the offenses in both cases were identical ... source in both cases was the same ... [and] seizures occurred within days of each other").

**35.** *Sykes*, 7 F.3d at 1336.

**36.** *Hahn*, 960 F.2d at 909–910 (footnote omitted) (quoting U.S.S.G. § 1B1.3, comment. (backg'd.)).

**37.** *Sykes*, 7 F.3d at 1336.

**38.** *Id.*

**39.** *Mullins*, 971 F.2d at 1145.

Accordingly, the district court clearly erred in determining that Maxwell's distribution of an additional 546 grams of cocaine was relevant conduct pursuant to § 1B1.3(a)(2).[40]

Maxwell's second challenge is to the increase in his offense level based on his aggravating role in the offense. The district court increased Maxwell's offense level by four pursuant to U.S.S.G. § 3B1.1(a), which provides for such an increase if "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." Maxwell contends this was error.

■ Our resolution of this issue is dictated by this court's decision in a related appeal, *United States v. Yates*,[41] in which this court reversed the district court's decision to increase Yates' offense level by four pursuant to § 3B1.1(a). Yates was indicted along with Maxwell but was not tried with him, as Yates entered a plea of guilty to the charge of conspiring to distribute dilaudid. At Maxwell's trial, Lundy testified that Yates and Maxwell were his two sources for dilaudid.[42] Lundy's testimony indicates that his relationship with Maxwell did not differ significantly from his relationship with Yates.[43] When Yates appealed his sentence, this court held that application of an increase pursuant to § 3B1.1(a) was inappropriate because there was no evidence of anything other than a seller/buyer relationship between Yates and

Lundy. We see no reason why the same holding should not also apply to Maxwell. Accordingly, we hold that Maxwell's offense level should not have been increased by four pursuant to § 3B1.1(a).

■ Johnson raises three challenges to the calculation of her sentencing guidelines range. She argues that the district court erred in declining to reduce her offense level for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1, and in declining to reduce her offense level for her allegedly minor role in the offense, pursuant to U.S.S.G. § 3B1.2. We have carefully reviewed the record, and we see nothing to indicate that the district court's findings as to these two matters should be disturbed. Finally, Johnson argues that the district court erred in holding her accountable for the drugs that Smith, her husband, purchased from Lundy; she contends that she should only be held accountable for the drugs that she personally purchased from Lundy. Under the sentencing guidelines, a member of a drug conspiracy is accountable for the "conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant."[44] At Johnson's trial, Lundy testified that Johnson sometimes obtained dilaudid and delivered money for her husband. An officer who took Johnson's post-arrest statement testified that Johnson admitted that she and her husband distributed the dilaudid they obtained from

---

**40.** Because we hold that the cocaine distribution is not relevant conduct for purposes of § 1B1.3, we need not decide whether the district court's underlying finding that Maxwell distributed 546 grams of cocaine is clearly erroneous. We note, however, that this finding is based upon erroneous information. The probation officer, in preparing Maxwell's Presentence Report, calculated the amount of cocaine Dycus had sold for Maxwell by multiplying the number of grams Dycus sold per night by the number of days Dycus was involved in such sales. The Presentence Report states that Dycus testified at trial that he sold cocaine for Maxwell for a period of approximately six months. Maxwell's Presentence Report at ¶ 15. In fact, Dycus did *not* testify that he sold cocaine for Maxwell for six months; rather, he testified that he sold cocaine for Maxwell for "[p]robably a month and a half to two months." R5–196. Accordingly, the probation officer's conclusion, which the district court apparently adopted, that Dycus distributed 546 grams of cocaine for Maxwell is clearly erroneous.

**41.** 990 F.2d 1179 (11th Cir.1993).

**42.** R5–72.

**43.** *See* R5–75; R5–78. There is evidence in the record that Yates may have dealt in larger quantities of drugs than did Maxwell, as Yates sold Lundy more than twice as many dilaudid pills as did Maxwell over approximately the same period of time. *See* Maxwell's Presentence Report at ¶ 13.

**44.** In the sentencing guidelines in effect at the time of Johnson's sentencing hearing, this language was set out in the commentary to U.S.S.G. § 1B1.3. *See* U.S.S.G. § 1B1.3, comment. (n. 1) (1991). Since that time, similar language has been incorporated into the guideline itself. *See* U.S.S.G. § 1B1.3(a)(1)(B) (1993); U.S.S.G.App. C, amendment 439 (1993).

Lundy. There is sufficient evidence to support the district court's finding that Johnson is accountable for her husband's drug dealings. Accordingly, Johnson's challenges to her sentence are without merit.

### CONCLUSION

For the reasons explained above, the convictions of Maxwell, Woods, and Johnson are AFFIRMED, and the sentences of Woods and Johnson are AFFIRMED. Maxwell's sentence is VACATED and his case REMANDED for resentencing.