**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Francisco SOTO, Defendant–Appellant.**

No. 02–2465.

United States Court of Appeals, Sixth Circuit.

Dec. 22, 2003.

B. Rene Shekmer, Hagen W. Frank, U.S. Attorney's Office, Grand Rapids, MI, for Plaintiff–Appellee.

Lawrence J. Phelan, Grand Rapids, MI, for Defendant–Appellant.

Before GUY and GILMAN, Circuit Judges; and REEVES, District Judge.*

REEVES, District Judge.

Francisco Soto appeals the sentence he received after pleading guilty to a conspiracy to distribute more than 50 grams of cocaine base (crack). More specifically, he objects to the two-level enhancement imposed by the district court for possession of a weapon during the commission of a drug offense. For the reasons set forth herein, we **AFFIRM** the judgment of the district court.

* The Honorable Danny C. Reeves, United States District Judge for the Eastern District of Kentucky, sitting by designation.

## I. BACKGROUND

On January 9, 2000, the Kalamazoo County, Michigan sheriff's department conducted a traffic stop of the defendant who, at the time, was using the name Pedro Camarena. Soto was issued a citation for impaired visibility. After noticing that the defendant was acting suspiciously, officers received permission to conduct a search of his vehicle. During this search, the officers discovered a tabulation sheet and five Ziploc bags which contained smaller packaged quantities of suspected cocaine. The drugs were seized and the defendant was arrested. Subsequently, Soto was released on a $5,000.00 cash bond.

Four days after the traffic stop and arrest, the defendant called the sheriff's office and asked for the return of his keys which had been confiscated during the search. Officers complied with this request and delivered the keys to Soto's home later that day. Upon their arrival at the residence, officers spoke with Lou Ann Warren, who was living with Soto at the time. Following some discussion, the officers were given permission to walk through the home.

During this walk-through, officers discovered a large box in the master bedroom containing two gallon-size Ziploc bags with several smaller bags containing suspected marijuana. In addition, the officers found two digital scales, a large amount of currency, a .357 caliber handgun, and clothing and identification belonging to Soto. Further investigation resulted in the discovery of 100.5 grams of cocaine. (J.A. at 58.) Soto was subsequently charged and convicted in state court for possession of narcotics. On March 11, 2002, pursuant to a

Plea Agreement, Soto received a sentence of 25 months to 20 years. (J.A. at 66.)

Prior to the defendant's conviction in state court, the Kalamazoo Valley Enforcement Team (KVET) commenced an investigation concerning ongoing cocaine trafficking activity involving Robert Baldwin. Based on information received from a confidential informant, the KVET learned that Baldwin was acting as a "runner" for another individual, Phillip Hazen. Additional information indicated that Hazen's supplier (identified as "Pedro") brought marijuana and cocaine from the Chicago, Illinois area. (J.A. at 59.) Baldwin and Hazen were found together on October 18, 2001, and Baldwin was placed under arrest for outstanding warrants. A search incident to this arrest resulted in the discovery of substantial quantities of cocaine.

After waiving his Miranda rights, Hazen admitted his involvement in the distribution of cocaine and marijuana in the Kalamazoo area. During subsequent interviews, Hazen admitted that he received the drugs from an individual known as "Pedro." Hazen reported that Pedro was in town and was in possession of a large amount of cocaine and marijuana. Hazen stated that he usually obtained approximately 9 ounces of cocaine from Pedro during separate transactions. After agreeing to order that amount, Hazen attempted to contact and eventually received a return call from Pedro.

During surveillance, and while he was en route to meet Hazen, Soto (then known as "Pedro") committed several traffic violations and was stopped by members of the KVET. During this stop, Soto produced a driver's license and falsely identified himself as Alvino Chavez. A consensual search of Soto's vehicle resulted in the discovery of cocaine and marijuana located in a plastic grocery bag on the driver's side floor board. Additional powder and crack cocaine and marijuana were later discovered at Soto's trailer. During a subsequent custodial interrogation, Soto admitted his true identity. (J.A. at 60–61.)

## II.  PROCEDURAL HISTORY

On February 14, 2002, Francisco Soto, Mario Soto, Jose Soto and Philip Hazen were indicted in the United States District Court for the Western District of Michigan. Count one of the three-count indictment charged all four defendants with conspiracy to distribute more than 50 grams of cocaine base in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(c) and 846 between the summer of 2001 and October 18, 2001. In count two, the grand jury charged the defendant and two of his co-defendants with conspiring to distribute more than 50 grams of cocaine base between October 1 and 18, 2001, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)(iii). Finally, in count three, Soto and two co-defendants were charged with possession of more than 50 grams of cocaine base with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), and 841(b)(1)(A)(iii).

On June 26, 2002, Soto entered a guilty plea to count two of the indictment pursuant to a written plea agreement. In accordance with U.S. Sentencing Guidelines Manual § 2D1.1 (c)(2) (2002), Soto was assessed a Base Offense Level of 36 as a result of the offense of conviction and the volume of drugs attributable to him from the 2000 and 2001 charges. In part, the Presentence Report contained the following factual summary relating to Soto:

Mr. Soto was arrested on January 9, 2000, for possession of 94.35 grams of powder cocaine. On January 13, 2000, Mr. Soto's residence was searched by the police and an additional 100.5 grams of powder cocaine, 90 kilograms of marijuana, and a .357 Magnum handgun were found. Mr. Soto is considered the

leader in this conspiracy involving at least five participants. He recruited his brothers to participate in this matter and was responsible for paying them for their participation. He is responsible for all the drugs discovered in this conspiracy of which the government was aware prior to his proffer statement. A total of 497.58 grams of cocaine powder, 217.77 grams of marijuana, and 938.81 grams of crack cocaine were seized in this matter. Converting the quantity of drugs into marijuana equivalent produces a total of 18,875.94 kilograms of marijuana. Converting the quantity of drugs into marijuana equivalent produces a total of 39.87 kilograms of marijuana. Combining this total with the previous total utilized for the instant offense, Mr. Soto will be held accountable for 18,915.81 kilograms of marijuana.

(J.A. at 63.)

Paragraph 59 of the Presentence Report contains the two-level adjustment to his offense level in dispute. That paragraph provides a specific offense characteristic based on the discovery of the handgun found during the January 13, 2000, search of the defendant's home. After receiving credit for acceptance of responsibility, Soto's adjusted offense level was 35.

Although Soto was charged and convicted in state court regarding the drugs found during the January 13, 2000, search, no criminal history points were assigned for this conduct because the probation officer, and subsequently the district court, concluded that this conduct was part of the instant offense. (J.A. at 66.) Based on one other unrelated conviction and because the underlying conviction occurred while Soto was on probation, the defendant was assessed three criminal history points, placing him in criminal history category II. Thus, Soto's guideline range of imprisonment was determined to be 188 to 235 months.

While Soto's counsel objected to the two-level enhancement related to possession of the handgun, Soto did not object to the inclusion of the drugs which were found during the January 2000 arrest. (J.A. at 75–82.) Instead he conceded that no factual issue existed regarding the location of the firearm which was found in *his* master bedroom during the January 2000 search. Further, he admitted that, under the relevant sentencing guidelines, a presumption exists that the weapon was "connected to the drug conspiracy." (J.A. at 78.)

Counsel argued, however, that Soto had met his burden of showing that it was "clearly improbable" that the handgun was connected to the conspiracy because it was not used to protect the defendant, the money or the cocaine; it was not carried by Soto during any drug transaction; and it was not used to facilitate any drug transaction. In addition, he argued that, at the time of the search, Soto could legally possess the firearm because he was not a convicted felon. Thus, he asserted his storage of the gun in his master bedroom was proper. And because the handgun was found unloaded, he claimed that no inference should be drawn that the weapon was connected with the drug conspiracy. (J.A. at 79.) Further, during the sentencing hearing, Soto's counsel repeated some of his written objections and argued that, while the defendant "possessed" the handgun, he did not do so "in connection with" the drug trafficking offense. (J.A. at 40–41.)

In rejecting these arguments, the district court made specific, detailed factual findings concerning Soto's possession of the handgun. With respect to the location of the drugs and related materials, the court noted that Soto's argument would be

stronger if the firearm had been located in an area remote to the drugs. Instead, however, the court found that

> [t]his case is different. And it's interesting that in this bedroom where Ms. Warren indicates everyone apparently agrees that Mr. Soto and she resided, slept, dressed, whatever, were two gallon-size Ziploc bags with numerous smaller bags of suspected marijuana, two digital scales, a large sum of U.S. currency, the .357 Magnum handgun, identification belonging to this defendant, and the discovery of 100.5 grams of cocaine. So in the same room that all this drug paraphernalia and contraband that is the genesis, that is part of the genesis of this complaint was found the .357 in the middle.

(J.A. at 46.) The Court also noted that the handgun had little or no value for hunting or recreational purposes. (J.A. at 46.)

Based on its proximity to drugs and drug paraphernalia as well as the type of weapon found, the court drew the inference that it was probable that at least one of the main reasons for having the handgun was either to protect the defendant from persons who were trafficking in drugs with him or to use against other persons. (J.A. at 47.) Further, the Court noted that the firearm's unloaded character "may very quickly be changed with the addition of a bullet or two." (J.A. at 47.)[1]

## III. ANALYSIS

### A. Standard of Review

The district court's legal determinations are reviewed *de novo. United States v. Tilford,* 224 F.3d 865 (6th Cir.2000); *United States v. Caseslorente,* 220 F.3d 727 (6th Cir.2000). However, this Court reviews for clear error the district court's factual finding that a defendant possessed a weapon in connection with a drug offense. *United States v. Keszthelyi,* 308 F.3d 557, 578–79 (6th Cir.2002); *United States v. Pruitt,* 156 F.3d 638, 649 (6th Cir.1998). Likewise, whether a defendant's actions amount to relevant conduct under the sentencing guidelines is a question of fact subject to the clearly erroneous standard. *United States v. Kappes,* 936 F.2d 227, 229 (6th Cir.1991). A district court's finding is clearly erroneous if "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

### B. U.S.S.G. § 2D1.1(b)(1)

With respect to drug offenses, the sentencing guidelines provide that a defendant's base offense level should be increased by two levels if he possessed a dangerous weapon. U.S.S.G. § 2D1.1(b)(1).[2] Application Note 3 to this

---

1. After Soto's objection was overruled, the United States moved the court to depart downward four levels based on the defendant's substantial cooperation. (J.A. at 23–24.) Although Soto's counsel requested that the court consider even a further reduction, the Court declined this request and instead found that the defendant's cooperation warranted a three-level departure. (J.A. at 50, 52.) Based on an adjusted offense level of 32, the Court imposed a sentence at the bottom of the sentencing range of 138 months. (J.A. at p. 53.)

2. Although this section previously required that the defendant possess the weapon during the course of the offense, a 1991 amendment eliminated the requirement that possession must occur "during commission of the offense." This modification clarifies that the relevant conduct provisions apply to this section. *See* U.S.S.G.App. C, amendment 394. Therefore, a weapon need not actually be possessed during the offense of conviction for the enhancement to apply. *See David v. United States,* 134 F.3d 470, 475–76 (1st Cir.1998) (the amendment "makes it plain that the 'rel-

section states that "[t]he adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense."

Under this section, the United States must prove, by a preponderance of the evidence, that the defendant actually or constructively possessed the weapon. Constructive possession includes ownership, dominion or control over the item itself, or dominion over the premises where the item is located. *Pruitt,* 156 F.3d at 649; *United States v. Hill,* 79 F.3d 1477, 1485 (6th Cir.), *cert. denied,* 519 U.S. 858, 117 S.Ct. 158, 136 L.Ed.2d 102 (1996). Further, once it is established that the defendant possessed a firearm, the burden shifts to him to establish that it is clearly improbable that the weapon was connected to the offense. U.S.S.G. § 2D1.1, cmt. n. 3; *Hill, supra* at 1485.

This enhancement has been upheld in instances in which the weapon was unloaded or otherwise inoperable. *United States v. Harris,* 128 F.3d 850, 853 (4th Cir.1997) (unloaded firearms); *United States v. Mitchell,* 31 F.3d 271, 278 (5th Cir.1994) (unloaded and possibly inoperable gun); *United States v. Ewing,* 979 F.2d 1234, 1238 (7th Cir.1992) (unloaded pistol); *United States v. Paulk,* 917 F.2d at 882 (inoperable and unloaded pistol); *United States v. Heldberg,* 907 F.2d 91, 94 (9th Cir.1990) (unloaded firearm); *United States v. Smith,* 905 F.2d 1296, 1300 (9th Cir.1990) (inoperable); *United States v. Burke,* 888 F.2d 862, 869 (D.C.Cir.1989) (gun need not be operable); and *United States v. Luster,* 896 F.2d 1122, 1128–29

(8th Cir.1990) (the inoperability of the firearm should not bar application of the enhancement provision).

**C. Waiver**

■ The indictment alleged two separate conspiracies. Count one of the indictment alleges a conspiracy taking place between the summer of 2001 and the date of the defendant's arrest on October 18, 2001. The second count to which Soto entered a guilty plea alleged a conspiracy occurring between October 1 and 18, 2001. According to his counsel, there is no allegation that Soto possessed, either directly or indirectly, a firearm during the time frames of any of the charged crimes, including the offense of conviction. He points out that the participants in the 2000 activity that was the subject of the conviction in state court were not the same participants identified in the federal indictment. According to Soto, there is nothing in the record indicating a common modus operandi or a common location for the drug-related activities.

In response, the United States asserts that Soto did not preserve this specific claim of error because he did not argue before the district court that his possession of the handgun in January 2000 was not during the commission of the offense. Instead, the government points out that, in his written objection to the Presentence Report (and at sentencing), the defendant asserted that

> there is no dispute that a firearm was
> found in the Defendant's master bed-

evant conduct' provisions … apply to the adjustment in section D.1(b)(1)''); *United States v. Smith,* 127 F.3d 1388, 1389–90 (11th Cir.1997) (noting the amendment in affirming an enhancement for possession of gun carried during a dismissed offense that occurred three months after the related offense of conviction); *United States v. Quintero,* 937 F.2d

95, 97–98 (2d Cir.1991) (gun possessed during dismissed drug count may be used for § 2D1.1(b)(1) enhancement on other drug count that was part of the same course of conduct); and *United States v. Paulk,* 917 F.2d 879, 884 (5th Cir.1990) (firearm possessed during related drug conspiracy may be considered).

room during the January 2000 search. As such, *there is a presumption that the weapon was connected to the drug conspiracy.* The burden now shifts to the Defendant to show this Court that it was clearly improbable that the handgun was connected to the offense.

(Emphasis added.) (Appellee's brief at p. 10)

The United States correctly notes that, pursuant to Rule 32(i)(3)(A) of the Federal Rules of Criminal Procedure, the Court at sentencing "may accept any undisputed portion of the presentence report as a finding of fact." Further, it argues that, because Soto did not make his current argument in writing or orally at sentencing, the district court did not have the opportunity to rule on the issue. Thus, it claims that the issue is not properly before this Court. *United States v. Tosca,* 18 F.3d 1352, 1355 (6th Cir.1994) (a defendant who fails to object to an error at sentencing forfeits his right to assert the error on appeal; a party desiring more particularized findings at the trial court must request them); *see also Taft Broadcasting Co. v. United States,* 929 F.2d 240, 243–45 (6th Cir.1991) ("as a rule, this court declines to entertain arguments not presented in the first instance to the district court"); and *White v. Anchor Motor Freight,* 899 F.2d 555, 559 (6th Cir.1990).

In addition, the government argues that the January 2000 offense constitutes "relevant conduct" for purposes of application of the Sentencing Guidelines. According to the United States, the defendant's failure to raise this issue below was not an accident, based on the fact that the resulting prior sentence would have required assessment of three additional criminal history points if it were not considered relevant conduct (resulting in a criminal history category III instead of category II).

This court agrees with the United States' position. Soto's argument ignores the fact that he conceded that the amount of drugs from the January 2000 arrest and conviction should be included as relevant conduct for purposes of determining his offense level. Additionally, he ignores the definition of a "prior sentence" as set forth in U.S.S.G. § 4A1.2(1) for purposes of determining criminal history and the guideline requirements relative to undischarged terms of imprisonment contained in U.S.S.G. § 5G1.3.

The potential impact of these provisions easily explains why the defendant's current argument was not raised before the district court. Application of these provisions also establishes that Soto did not suffer prejudice by failing to raise this issue below. And while this court finds that Soto waived this issue by failing to raise it below, the undisputed facts relating to his state court conviction constitute relevant conduct for sentencing purposes.

### D. Relevant Conduct

██ Uncharged conduct used for adjustment or departure purposes must have a sufficient connection to the offense of conviction to meet the definition of relevant conduct. *United States v. Cross,* 121 F.3d 234, 238–40 (6th Cir.1997). In *Cross,* this Court rejected the use of conduct that was not connected to the one drug distribution of which the defendant was convicted although it occurred during the course of his overall drug dealing. Likewise, in *United States v. Maxwell,* 34 F.3d 1006, 1010–11 (11th Cir.1994), the Eleventh Circuit refused to consider a conviction for an unrelated cocaine distribution that occurred a year earlier and involved different people than the prescription drug conspiracy and other cocaine distribution on which the defendant was convicted because

it did not meet the test for similarity, regularity, and temporal proximity.[3]

Relevant conduct under the sentencing guidelines includes all acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction. U.S.S.G. § 1B1.3(a)(2). In order for the defendant's cocaine dealing in 2000 to be part of the same course of conduct as the offense conduct, the court must examine "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." *Hill*, 79 F.3d at 1481–82. And in order for the 2000 cocaine dealing to be part of a common scheme or plan relating to the offense of conviction, the earlier conduct must be substantially connected by at least one common factor such as "common victims, common accomplices, common purpose, or similar *modus operandi.*" *Id.; United States v. Faison*, 2003 U.S.App. LEXIS 20071 (6th Cir., Sept. 12, 2003).

Admittedly, the time interval between Soto's offenses provides little support for a conclusion that the incidents are part of the same course of conduct. However, the undisputed facts support a finding that the nature of the offenses are substantially similar and that the defendant's *modus operandi* was the same for both offenses. On both occasions, Soto had in his possession or in his residence large amounts of drugs that were separated into smaller quantities. The items seized indicate that he weighed these smaller amounts and placed them into ziploc bags. Information received from one of the co-defendants at the time of his arrest indicated that Soto obtained large amounts, but that he sold

smaller quantities. Therefore, Soto's activities in January 2000 and October 2001 were substantially similar. These facts, combined with the defendant's tacit admission that the January 2000 conduct was "relevant conduct" for purposes of calculating the amount of drugs attributable to him, are sufficient to support a conclusion that the earlier offense was part of the same course of conduct.

Soto's failure to object to the factual findings contained in paragraph 50 of the Presentence Report and adopted by the district court also supports this conclusion. This paragraph states, in relevant part, that Soto, as the leader of the conspiracies, should be held responsible for all of the drugs discovered in connection with the 2001 arrests as well as the cocaine and marijuana found during his January 9, 2000, arrest and the subsequent January 13, 2000, search of his residence. It was during this search that the handgun and drug paraphernalia were found in Soto's bedroom.

Likewise, Soto failed to object to paragraph 72 of the Presentence Report which outlines the state court conviction related to the January 2000 arrest. After setting out the relevant information, the Presentence Report cites U.S.S.G. § 4A1.2(a)(1) for the determination that no criminal history points should be assessed for this offense because "it is considered to be part of the instant offense." (J.A. at 66.) As indicated in Application Note 1 to this section of the guidelines, "conduct that is part of the instant offense means conduct that is relevant conduct to the instant of-

---

**3.** The Tenth Circuit reached a contrary result in *United States v. Roederer,* 11 F.3d 973, 977–80 (10th Cir.1993), holding that drug amounts from a conspiracy that ended in 1987 constituted relevant conduct for a 1992 cocaine distribution where evidence tended to show

that the defendant distributed cocaine "from the 1980s through May, 1992, [and his] conduct was sufficiently similar and the instances of cocaine distribution were temporally proximate".

fense under the provisions of U.S.S.G. § 1B1.3 (Relevant Conduct)."

For these reasons, this court finds that the defendant's 2000 drug dealings and his related possession of a handgun in connection with those dealings constitutes relevant conduct for sentencing purposes.

## E. Possession

■ The facts set forth in paragraph 14 and 15 of the presentence report describe the defendant's traffic stop and search and seizure of drugs resulting in his state conviction. These paragraphs specifically state that:

14. On January 9, 2000. Kalamazoo County Sheriff's Department initiated a traffic stop and made contact with Francisco Soto, who was utilizing the name Pedro Camarena. A citation was issued for impaired visibility. Officers noted Francisco Soto was acting suspiciously, and officers asked for and received permission to conduct a search of his vehicle. They discovered five Ziploc bags, each containing smaller packaged quantities of suspected cocaine. Also found was a tabulation sheet. The total weight was 94.35 grams of powder cocaine. The drugs were seized and the defendant was arrested. Mr. Soto was released on a $5,000.00 cash bond the same day.

15. On January 13, 2000. Kalamazoo County Sheriff's Department received a telephone call from Francisco Soto requesting to receive his keys which were confiscated during the search. Officers arrived at Francisco Soto's residence the same day and spoke with his significant other, Lou Ann Warren. Ms. Warren gave officers permission to walk through her home to insure there were no drugs in the residence. Officers discovered a large box in the master bedroom containing two gallon-size Ziploc bags with numerous smaller bags of suspected marijuana. They also located two digital scales and a large sum of U.S. currency. A .357 Magnum handgun, clothing, and identification belonging to the defendant was also found. Further investigation resulted in the discovery of 100.5 grams of cocaine.

(J.A. at 58.)

Soto contends that the evidence before the district court was insufficient to support its decision. He asserts that, although Lou Anne Warren allowed the search to proceed, there are insufficient facts to establish his relationship to Warren and, more importantly, his connection to the residence. Soto argues that the information set forth in this portion of the Presentence Report is unclear with respect to the exact location of the items seized or the location of the firearm in relation to these items. Further, he claims that there are no facts which "necessarily link" him to the firearm.

Likewise, Soto contends that it is unclear whether the phrase "belonging to the defendant" contained in paragraph 15 modifies "identification" or "clothing and handgun." He asserts that if the phrase is only meant to modify "identification," paragraph 15 is insufficient to support an argument that the handgun and other items in the bedroom belonged to him. According to Soto, "one could construe a number of scenarios which would either distance the gun from drugs or link the weapon to drugs."

These arguments are fatally undercut by Soto's written objection prior to sentencing. At that time, he conceded that

there is no dispute that a firearm was found *in the Defendant's master bedroom* during the January 2000 search. As such, there is presumption that the weapon was connected to the drug conspiracy. The burden now shifts to the Defendant to show this Court that it was clearly improbable that the handgun was connected to the offense.

Soto's counsel reiterated this written argument during the sentencing hearing. (J.A. at 40–41.) At the sentencing hearing, Soto did not assert that he did not own or possess the firearm. Instead, he argued that he was legally able to do so and that the gun was not loaded and was not connected with his drug activities.

Based on the defendant's concessions that the firearm was his, the court did not need to inquire further concerning issues of ownership and possession. However, after reviewing the evidence presented, the district court properly concluded that, at a minimum, Soto constructively possessed the weapon.

### F. The firearm's connection with the drug offense

█ Even if his other arguments are rejected, Soto asserts that it was clearly improbable that the weapon was linked to the drugs involved in the January 2000 arrest. Citing *United States v. Hill,* 79 F.3d 1477 (6th Cir.1996), *United States v. Garner,* 940 F.2d 172 (6th Cir.1991), and *United States v. Zimmer,* 14 F.3d 286 (6th Cir.1994), he claims that discovery of a weapon in the residence of a drug trafficker does not automatically trigger the two-level weapon enhancement. Instead, a factual analysis of the relevant factors is first required. Because Soto claims there is no evidence that: (i) he carried the weapon in connection with any drug deal; (ii) he used the weapon to protect himself or his drugs; or (iii) the gun was loaded or that ammo

was nearby, he asserts that it was "clearly improbable" that the weapon was linked to the drugs.

In rejecting Soto's arguments, the district court noted that, as an illegal alien, Soto could not legally possess the weapon. The court also held that it was probable that the subject weapon was involved in the offense:

This Court has ruled on a number of circumstances and counsel for the defense articulately sets exactly the format of where this case finds itself. You follow the drugs. Where are the drugs? If the drugs are found in the basement in the corner of a closet and the .357 is found upstairs or in a kitchen drawer, then I agree. Then the question of being improbable becomes a more real question. And the Court has had a number of those circumstances particularly with .22 rifles and Mossberg shotguns and Ithaca automatic .12 gauges where there [sic] kind of near the drugs, but they're—you know, whether they're loaded or not I agree is not determinative, but those present really sticky questions.

This case is different. And it's interesting that in this bedroom where Ms. Warren indicates *and everyone apparently agrees that Mr. Soto and she resided, slept, dressed, whatever,* were two gallon-size Ziploc bags with numerous smaller bags of suspected marijuana, two digital scales, a large sum of U.S. currency, the .357 Magnum handgun, identification belonging to this defendant and the discovery of 100.5 grams of cocaine. So in the same room that all this drug paraphernalia and contraband that is the genesis, that is part of the genesis of this complaint was found the .357 in the middle.

The district court then took notice that the handgun has no value for hunting and

is a weapon used for offensive or defensive purposes. Based on the undisputed information and evidence, the court concluded that, due to its proximity to drugs and drug paraphernalia and the defendant's identification, at a minimum, the firearm was constructively possessed by Soto. (J.A. at 47.)

The district court drew a proper inference that at least one reason for having the handgun was to protect the defendant from individuals trafficking in drugs or to use it against other persons. Additionally, the court found that the fact that the gun was unloaded was of no consequence because that status could be quickly changed "with the addition of a bullet or two." (J.A. at 47.) Once this finding was made, evidence that the firearm was used or carried in connection with the drug offense was not necessary. *United States v. Kincaide*, 145 F.3d 771, 784 (6th Cir.1998), *cert. denied*, 525 U.S. 1166, 119 S.Ct. 1085, 143 L.Ed.2d 86 (1999). Likewise, it was not necessary to conclude that the gun was loaded. *McLaughlin v. United States*, 476 U.S. 16, 17, 106 S.Ct. 1677, 90 L.Ed.2d 15 (1986). Accordingly, the district court properly rejected Soto's argument that it was "clearly probable" that he did not possess the firearm in connection with the drug offense.

## IV. CONCLUSION

For the reasons discussed above, we **AFFIRM** the sentence imposed by the district court.