[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-11576
Non-Argument Calendar
_____

D.C. Docket No. 4:15-cr-00204-WTM-GRS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LARRON R. BRUCE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(December 19, 2016)

Before TJOFLAT, WILLIAM PRYOR, and ROSENBAUM, Circuit Judges.

PER CURIAM:

Larron R. Bruce ("Bruce") appeals his 170-month sentence of imprisonment after pleading guilty to conspiracy to possess with intent to distribute cocaine hydrochloride ("cocaine") and cocaine base ("crack cocaine") to manufacture crack cocaine.  On appeal, Bruce argues that the district court clearly erred in applying the relevant-conduct guideline, U.S.S.G. § 1B1.3, when calculating the drug quantity for which he was held responsible at sentencing.  The district court, Bruce asserts, improperly enhanced his sentence using unreliable information about prior crack-cocaine sales which were not part of the same scheme or course of conduct as the offense of conviction.  After careful review, we affirm.

## I.

Bruce was a supplier of cocaine and crack cocaine in Liberty County, Georgia.  The investigation into Bruce's activities began in June 2014, when a confidential informant ("CI") purchased one gram of crack that was delivered to the dealer by Bruce during the course of the transaction.  From June 2014 to October 2015, law enforcement investigated Bruce's activities using controlled drug buys, surveillance, court-authorized tracking devices and pen registers, witness interviews, and other techniques.

Bruce was arrested on the night of October 27, 2015, after the fifteen-year-old daughter of Timecka Green, a co-defendant, called police to report that Bruce and others were manufacturing crack cocaine at Green's home while her mother

2

was away.  The fumes from the manufacturing process were making the girl and five other children in the home nauseous.  When officers arrived at the home, Bruce and several other men fled into a nearby wooded area, where Bruce was quickly located and arrested.  Officers found 21.5 grams of cocaine and $7,100 in Bruce's underwear.

Soon after, officers executed a search warrant at Green's home and found 453 grams of cocaine, 40.8 grams of crack cocaine, and other items commonly used in manufacturing crack cocaine.  The fifteen-year-old girl told officers that she had seen Bruce "cooking crack" at the home on multiple occasions.

Bruce agreed to talk to officers the morning after his arrest.  During the interview, he stated that it was "an everyday thing" for him to manufacture crack cocaine at Green's home, that others used the home for the same purpose, and that he had manufactured crack cocaine at the home on twenty separate occasions.

Over the course of the investigation, officers also interviewed several witnesses, including Charles Mention, Anthony Andrews, Leigh Taylor, and the CI.  According to Mention, Bruce was one of the top three crack-cocaine distributors in Liberty County, and he manufactured crack cocaine at the homes of both his mother and his cousin, Willie Nelson Bruce.  Mention bought crack cocaine from Bruce on at least one-hundred separate occasions.

3

According to Andrews, Bruce manufactured and sold crack cocaine. For some unspecified period of time, Andrews bought 5 grams of crack cocaine from Bruce every three to four days. At least once, Andrews bought 20 grams of crack cocaine. The largest amount of drugs Andrews ever saw in Bruce's possession was 7 ounces (198.4 grams) of cocaine in the fall of 2014. The last time Andrews bought crack cocaine from Bruce was in the fall of 2014 at Bruce's mother's home, where he saw Bruce sell crack cocaine to two other persons.

Taylor likewise told officers that Bruce manufactured and sold crack cocaine. According to Taylor, she bought crack cocaine from Bruce up to three times per day, five days per week for two to three years before June 2014. In addition, Bruce told Taylor to contact Alexander Roberts if Taylor needed crack cocaine but Bruce was unavailable. In July 2014, police observed Robertson at Bruce's mother's home conducting what appeared to be a drug transaction with Bruce, who mentioned that he needed to "cook."

Finally, the CI told officers that Bruce controlled the majority of the drug sales in the Georgia cities of Midway, Richmond Hill, and Hinesville. According to the CI, Bruce regularly bought large quantities of cocaine from Miami, Atlanta, and Brunswick, Georgia, and converted the cocaine into crack cocaine.

**II.**

4

A federal grand jury returned an indictment charging Bruce and several co-defendants with conspiracy to possess with intent to distribute cocaine and crack cocaine and to manufacture crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846, in addition to other offenses.  According to the indictment, the conspiracy began "at a time unknown to the Grand Jury but at a time between in or about March 2015, and in or about November 2015," and it took place "in Liberty County . . . and elsewhere."  Bruce pled guilty to the conspiracy offense under a written plea agreement.

Before sentencing, a probation officer prepared Bruce's presentence investigation report ("PSR"), which calculated his sentencing guideline range.  Bruce's base offense level of 30 was derived from the quantity of drugs involved in his offense.  *See* U.S.S.G. § 2D1.1(a)(5), (c)(5).  With a four-level leadership enhancement and a three-level reduction for acceptance of responsibility, Bruce's total offense level was 31.  With a criminal history category of IV, Bruce's guideline range was 151 to 188 months of imprisonment.

The PSR attributed to Bruce 474.5 grams of cocaine and 590.8 grams of crack cocaine.  The amount of cocaine was based on what was found in Bruce's possession or during the search of Green's home.  The amount of crack cocaine was derived from the following sources: (a) 45.8 grams for the crack cocaine either sold to the CI or found in Green's home; (b) "25 grams of crack for the crack he

5

sold Anthony Andrews"; and (c) "520 grams of crack (1 gram of crack per day, 5 days per week for 2 years) for the crack he sold Leigh Taylor."[1]  The quantities of cocaine and crack cocaine were then converted into their marijuana equivalents, yielding a total equivalent amount of 2,204.6 kilograms of marijuana.  *See* U.S.S.G. § 2D1.1, cmt. n.8(B).

Bruce objected to the inclusion of any drug amounts derived from the interviews of Mention, Andrews, or Taylor.  Bruce asserted that these sales were not part of the charged conspiracy and were too remote in time to be included as relevant conduct.  He also suggested that the information obtained from these individuals was "flimsy," "baseless," and "manufactured."

In an addendum to the PSR, the probation officer responded that the amounts from Andrews and Taylor were included because the quantities of drugs seized did not "adequately reflect Bruce's significant involvement in the manufacturing and distribution of crack."  The probation officer included the sales involving Andrews and Taylor as relevant conduct because they both bought crack cocaine from Bruce around the time of the investigation, and the evidence showed that Bruce had been a major manufacturer and dealer of crack cocaine for years.

---

[1] The PSR did not attribute to Bruce any of the crack cocaine involving Mention, who stated he bought crack cocaine from Bruce on at least one-hundred separate occasions, nor did the PSR convert the drug proceeds found on Bruce at the time of his arrest into an equivalent quantity of cocaine.

At sentencing, Bruce's counsel clarified that Bruce's objections were legal ones, not "factual objections at all."  That is, Bruce's objections were about "how you calculate relevant conduct, the scope, duration[,] and size of a conspiracy and what would play into that."  However, Bruce's counsel did not elaborate any further on his objections at sentencing.

The district court, after adopting the PSR's findings of fact, agreed with the probation officer that the challenged conduct qualified as "relevant conduct" which could be used to estimate the quantity of drugs involved.  The court also found that the total drug quantity represented a very conservative estimate of the drugs involved in the offense.  As a result, the court adopted the guideline calculations in the PSR, setting the guideline range at 151 to 188 months of imprisonment.  The court sentenced Bruce to 170 months of imprisonment.

### III.

The district court's determination of drug quantity for sentencing is reviewed for clear error.  *United States v. Reeves*, 742 F.3d 487, 506 (11th Cir. 2014).  We also review the application of the relevant-conduct guideline for clear error.  *United States v. Siegelman*, 786 F.3d 1322, 1332 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 798 (2016).  We broadly interpret the provisions of the relevant-conduct guideline.  *United States v. Behr*, 93 F.3d 764, 765 (11th Cir. 1996).

Sentencing courts must consider all "relevant conduct," as defined in § 1B1.3, when calculating a defendant's guideline range. *Siegelman*, 786 F.3d at 1332. "Because the limits of sentencing accountability are not coextensive with the scope of criminal liability," relevant conduct may include both uncharged and acquitted conduct that is proven at sentencing by a preponderance of the evidence. *Id.* (internal quotation marks omitted). Conduct is "relevant" under § 1B1.3, and therefore may be attributed to the defendant for purposes of sentencing, if it "was 'part of the same course of conduct or common scheme or plan' as the offense of conviction." *United States v. Gomez*, 164 F.3d 1354, 1356 (11th Cir. 1999) (quoting U.S.S.G. § 1B1.3(a)(2)).

Offenses are part of the "same course of conduct" if they are "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3, cmt. n.5(B)(ii). To make that determination, we evaluate "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." *Fuentes*, 107 F.3d at 1525 (internal quotation marks omitted). In doing so, we consider "whether there are distinctive similarities between the offense of conviction and the remote conduct that signal that they are part of a single course of conduct rather than isolated, unrelated events that happen only to be similar in kind." *United States v. Maxwell*, 34 F.3d 1006, 1011 (11th

8

Cir. 1994) (quoting another source).  We will reverse only if we find that the district court clearly erred by relying at sentencing on "conduct which exists in discrete, identifiable units apart from the offense of conviction."  *Id.* (internal quotation marks omitted).

Here, the district court did not clearly err by including as relevant conduct Bruce's prior sales of crack cocaine to Andrews and Taylor.  First, we reject Bruce's challenge to the credibility of Andrew's and Taylor's statements to investigating officers.  At sentencing, Bruce expressly withdrew any factual challenge to these statements, clarifying that his objections were solely about "how you calculate relevant conduct, the scope, duration[,] and size of a conspiracy and what would play into that."  As a result, the district court did not err in treating the factual statements in the PSR as undisputed for purposes of sentencing, and the court properly relied on these facts at sentencing, even in the absence of supporting evidence.  *See United States v. Lopez-Garcia*, 565 F.3d 1306, 1323 (11th Cir. 2009) (stating that the failure to object to allegations of fact in the PSR admits those facts for sentencing purposes).[2]

Second, the district court did not clearly err in determining that the drug sales to Andrews and Taylor arose out of the same course of conduct as the offense

---

[2] In passing, Bruce asserts his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution.  However, this argument has not been adequately briefed on appeal, so we decline to consider it.  *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681–82 (11th Cir. 2014).

of conviction.  Bruce was convicted of conspiring to manufacture crack cocaine and to possess with intent to distribute cocaine and crack cocaine.  This conspiracy involved regularly manufacturing crack cocaine and selling small quantities to users at various locations in and around Liberty County, including the home of his cousin, Willie Nelson Bruce.  Other co-conspirators, both charged and uncharged, including Alexander Roberts, Gregory Harrington, and Willie Nelson Bruce, assisted Bruce in selling the crack cocaine.

The prior drug sales to Andrews and Taylor fit squarely within this same course of conduct.  Both Andrews and Taylor identified Bruce as a manufacturer and distributor of crack cocaine, and both individuals described regular purchases of small quantities of crack cocaine from Bruce over a period of time.  Moreover, the sales to Andrews and Taylor shared other similarities with the charged conduct. For instance, Andrews bought crack cocaine at Willie Nelson Bruce's home, where the CI also bought crack cocaine from Bruce during the course of the investigation. In addition, Bruce told Taylor to contact Roberts, a participant in the conspiracy, when Taylor needed crack cocaine and Bruce was not available.

The only factor that arguably weighs in Bruce's favor is temporal proximity. For instance, the indictment alleged that the conspiracy began "at a time between in or about March 2015, and in or about November 2015," but the uncharged

conduct includes drug sales to Taylor for a two-year period beginning in 2012.[3] Nevertheless, Taylor described continuous purchases of crack cocaine from Bruce during that two-year period, which extended up until around June 2014, when the investigation into Bruce's very similar charged conduct began. Similarly, Andrews described repeated purchases of crack cocaine from Bruce up until some point in the fall of 2014. In light of the repetitive nature of these similar prior sales, any lack of temporal proximity does not strongly suggest that they "were unrelated events that happen only to be similar in kind." *See Maxwell*, 34 F.3d at 1011; U.S.S.G. § 1B1.3 cmt. 5(B)(ii) ("When one of the above factors is absent, a stronger presence of at least one of the other factors is required."); *cf. United States v. Cedano-Rojas*, 999 F.2d 1175, 1180–81 (7th Cir. 1993) (finding a sufficient connection between prior drug transactions and the conduct of conviction despite a two-year gap between the offenses).

Bruce compares the facts of his case to the facts of *Maxwell* and *Gomez*, but both cases are distinguishable. In *Maxwell*, we held that uncharged conduct involving a cocaine distribution scheme was not relevant conduct for the counts of conviction, which involved a dilaudid distribution scheme. 34 F.3d at 1011.

---

[3] To the extent Bruce argues that the uncharged conduct cannot be included as relevant conduct under § 1B1.3 simply because it falls outside of the time period of the charged conspiracy, he is mistaken. *See Gomez*, 164 F.3d at 1357 ("[W]e have previously held—and continue to hold—that uncharged criminal activity outside of a charged conspiracy may be included in sentencing if the uncharged activity is sufficiently related to the conspiracy for which the defendant was convicted.").

Because the two schemes did not involve any of the same parties and were temporally remote, we concluded that the two schemes appeared to be isolated, and we declined to find that they constituted "a single course of conduct simply because they both involve drug distribution." *Id.*

In *Gomez*, this Court concluded that the district court clearly erred by relying on drug sales that were not part of the same course of conduct as the conspiracy charged in the indictment. 164 F.3d at 1356. We found that "[t]he course of conduct on which the indictment and the trial focused was the distribution of cocaine *through the Sparkling City Car Wash operation*, out of which the conspiracy operated and from which the relevant 'intent to distribute' applied." *Id.* at 1356 (emphasis in original). So, "only sales that are related to the Sparkling City Car Wash operation" qualified as relevant conduct. *Id.* Accordingly, we held that the district court erred by considering cocaine sales to a person who "was in no way connected to the Sparkling City Car Wash operation." *Id.* at 1356–57.

Here, in contrast to both *Maxwell* and *Gomez*, the uncharged conduct in this case is not "conceptually distinct" from the charged conspiracy. *See Gomez*, 164 F.3d at 1357. Unlike *Maxwell*, the uncharged conduct in this case shared similarities with the charged conspiracy, such as similar locations and similar participants, and also involved distribution of the same controlled substance as the charged conspiracy. And, unlike *Gomez*, the charged conspiracy in this case was

12

not limited to a particular location to which the uncharged conduct had no connection. Accordingly, Bruce's reliance on *Maxwell* and *Gomez* is unavailing.

Because the uncharged drug sales to Andrews and Taylor were substantially related to the conspiracy for which Bruce was convicted, the district court did not clearly err by treating these prior drug sales as relevant conduct when calculating his guideline range. *See Siegelman*, 786 F.3d at 1332; *Maxwell*, 34 F.3d at 1011. Accordingly, we affirm Bruce's sentence.

**AFFIRMED.**