[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 28, 2004
THOMAS K. KAHN
CLERK

No. 03-11252

_____

D.C. Docket No. 02-80050-CR-DTKH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DAMON AMEDEO,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(May 28, 2004)**

Before BLACK, BARKETT and STAHL[*], Circuit Judges.

STAHL, Circuit Judge:

_____

[*]Honorable Norman H. Stahl, United States Circuit Judge for the First Circuit, sitting by designation.

Defendant-appellant Damon Amedeo appeals from his sentence following a guilty plea to one count of distribution of cocaine to a person under twenty-one years of age, in violation of 21 U.S.C. § 859(a). We hold that the district court erred in upwardly departing from the Sentencing Guidelines, and remand for further sentencing proceedings.

I.      BACKGROUND

A.      Factual history

Evidence presented at the sentencing hearing established the following: In May, 2001, Amedeo met Douglas Rozelle III. At that time, Amedeo was a 29-year-old attorney and Rozelle was an eighteen-year-old student. Rozelle's father, an attorney, had hired Amedeo to work at his law firm beginning the previous month. After Rozelle's arrest for possession of marijuana and Xanax, Rozelle's father arranged for Amedeo to represent his son. These charges resulted in Rozelle's enrollment in a pretrial intervention program. Amedeo accompanied Rozelle to his first drug treatment appointment, where the therapist informed Amedeo that Rozelle had a "serious problem."

Subsequently, Amedeo and Rozelle began spending a great deal of time together. Rozelle's father, aware of only some of the meetings, was reassured by Amedeo that he would not allow young Rozelle to use drugs. Over the next

2

several months, however, Amedeo and Rozelle together used cocaine, marijuana, and various pills. According to witnesses at the sentencing hearing, Rozelle often used and distributed drugs in his college dorm, some of which were supplied by Amedeo. Rozelle had independent sources as well. Several of Rozelle's friends, all between the ages of nineteen and twenty-one, used marijuana with Amedeo and Rozelle at Amedeo's apartment.

During the fall of 2001, Rozelle's parents, who were divorced, expressed concern that their son was using drugs again. In particular, Rozelle's mother suspected that Rozelle was drug-impaired when he and Amedeo visited her on Thanksgiving. She told her ex-husband of her concerns, who in turn spoke to Amedeo. Amedeo assured Rozelle's father than Rozelle was not using drugs. In November, 2001, Rozelle was diagnosed with depression and was prescribed Celexa.

In early January, 2002, Rozelle informed his father that he wanted nothing further to do with Amedeo. Accordingly, Rozelle's father asked Amedeo to cease contact with Rozelle. Nonetheless, on January 5, 2002, Rozelle appeared at Amedeo's apartment after telling his mother he was going there to "appease" Amedeo before a pretrial intervention meeting scheduled for that week. Two friends of Amedeo, Charles Wilson and Anthony Costanzo, briefly were at the

apartment and testified that Rozelle was behaving erratically and appeared "pretty wasted." As they left Amedeo's apartment around 7:50 p.m., Amedeo said to them that he "wanted to fuck [Rozelle]."

Sometime between 1:00 a.m and 7:00 a.m. the following morning, Rozelle died of a drug overdose in Amedeo's apartment.

At around 10:15 a.m. on January 6, Amedeo left his apartment to meet Wilson and Costanzo. Amedeo was in an agitated condition; he told them that he and Rozelle had "partied hard" the night before and that Rozelle might be dead. Amedeo also stated that he and Rozelle had had unprotected sex twice the previous night and that Rozelle may have been asleep the second time.

After spending time at a restaurant and Wilson's residence, Amedeo, Wilson, and Costanzo returned to Amedeo's apartment at around 12:35 p.m. that day. Amedeo and Costanzo cleaned up the apartment, hid drug paraphernalia and took out the trash. However, Wilson testified that he does not recall any cleaning taking place. Around 12:46, after attempting to wake Rozelle, Amedeo called 911. Paramedics and law enforcement arrived, and a preliminary investigation into Rozelle's death began.

That day, Detective Amy Sinnott arrived at Amedeo's apartment to investigate Rozelle's death. Amedeo told Sinnott that he and Rozelle had sex,

4

after which Rozelle fell asleep in Amedeo's bedroom. Later, Amedeo had anal intercourse with Rozelle, during which Rozelle was breathing and may have said Amedeo's name, but was "kind of out of it." At some point after 12:30, Amedeo awoke to a wet spot in the bed. Concluding that Rozelle had urinated in the bed, Amedeo tried unsuccessfully to wake him. Amedeo stated that he then moved Rozelle to the floor and went to sleep in the other bedroom.

Amedeo consented in writing to a search of his apartment. In the master bedroom, Sinnott found a cut straw containing white powder and a jar containing marijuana. Licensed firearms were found locked in a case. Amedeo told Sinnott that only he and Wilson were in the apartment when the body was found; he did not reveal Costanzo's presence. Amedeo also did not reveal that Costanzo and Wilson had visited the previous night, stating only that a law school friend had stopped by in the afternoon. When Sinnott noted that there was no trash in the apartment, Amedeo denied removing it before calling 911.

At some point after the police investigation began, Amedeo called Costanzo and told him to say that he (Costanzo) was not in the apartment when Rozelle's body was found.[1] He also told Costanzo it was important to exaggerate the extent

---

[1]The district court found that this was because Amedeo did not trust Costanzo as much as he did his long-time friend Wilson.

of Amedeo's romantic relationship with Rozelle, to make the relationship sound "that it was a little more than it really was."

On January 11, 2002, a federal search warrant was executed at Amedeo's apartment. Agents of the Bureau of Alcohol, Tobacco and Firearms seized six firearms from the case discovered in the earlier search, as well as drugs and drug paraphernalia. The search also yielded a videotape containing three segments. The first segment was taped by Rozelle on the weekend of October 28, 2001, and depicted a sexual encounter between Rozelle and a woman named Megan Stepanek.[2] The second segment was taped by Amedeo and showed him performing oral sex on Rozelle, who appeared to be unconscious. The third segment, also taped by Amedeo, showed him and Rozelle using drugs together on or about November 11, 2001. They smoked marijuana and cocaine residue from a bong and snorted powdered cocaine hydrochloride. It was the cocaine use depicted in this segment that became the basis for Amedeo's offense of conviction. The district court found that the second and third videotaped segments occurred on the same night.

---

[2]Stepanek was Rozelle's girlfriend at the time. She testified that she did not recall engaging in the sex acts depicted on the videotape, and that at the time the tape was made, Rozelle had given her an Ativan pill that he said belonged to Amedeo.

Detective Sinnott searched Rozelle's mother's home, where Rozelle had been living. She found drug paraphernalia, three prescription bottles of Celexa, Xanax, marijuana and Ativan.

The toxicology report stated that Rozelle's death was a result of drug overdose, specifically, "polydrug toxicity" resulting from cocaine, methadone, Citralopam (Celexa) and Alprazolam (Xanax). The medical examiner who performed the autopsy testified that death resulted from the interaction of all four drugs, which combined to suppress Rozelle's central nervous system to the extent that his lungs filled with fluid and his heart and lungs stopped functioning.

A forensic toxicologist testified that there was no active cocaine in Rozelle's system; rather, there was cocaine metabolite, which reflected cocaine use at least twelve hours, and possibly up to several days, before his death. Neither the cocaine nor the Xanax, standing alone, was sufficient to cause death. The methadone and the Celexa individually were consumed at "toxic" levels. Nonetheless, neither expert testified unequivocally that either drug was independently fatal.[3] The forensic toxicologist testified that a small quantity of

_____

[3]The medical examiner offered somewhat contradictory testimony as to whether the methadone was present at a level that alone would have caused Rozelle's death.

Lorezepam (Ativan) was found in Rozelle's blood, which was "a little bit at the low end of the therapeutic range" rather than in the "toxic" range.

Amedeo's semen was found in Rozelle's underwear. Additional semen was found in Rozelle's anal canal, but its source could not be determined. There was no tearing or scarring of Rozelle's anus or rectum. The testimony at the sentencing hearing indicated that the lack of trauma could have resulted either from the absence of sexual assault (i.e., the sex was consensual) or from the relaxing effects of the drugs on Rozelle's body.

B.    Procedural history

Amedeo was arrested on February 7, 2002. He was charged in a nine-count superceding indictment alleging one count of unlawful drug use while in possession of a firearm, 21 U.S.C. § 922(g)(3); one count of distribution of cocaine to a minor, 21 U.S.C. § 859; one count of cocaine distribution, 21 U.S.C. § 841; five counts of distribution of marijuana to a minor, 21 U.S.C. § 859; and one count of possession with intent to distribute marijuana, 21 U.S.C. § 841. Amedeo and the government entered a plea agreement in which Amedeo agreed to plead guilty to the count of distributing cocaine to a minor, 21 U.S.C. § 859(a), and the government agreed to drop the remaining charges.

The procedural maneuvering leading up to the sentencing was unusually complex. A Presentence Investigation Report (PSI) was issued, then repeatedly revised. The government recommended a reduction to Amedeo's sentence based on acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a). It also requested enhancements on two grounds: (1) that Amedeo had abused his position of trust as Rozelle's attorney, pursuant to § 3B1.3; and (2) that Rozelle was a "vulnerable victim" because of his prior drug problems, pursuant to § 3A1.1. Lastly, the government recommended an upward departure pursuant to § 5K2.0 on the ground that Amedeo distributed drugs to multiple minors. Pursuant to Burns v. United States, 501 U.S. 129 (1991), the district court twice issued notices of intent to consider additional grounds for upward departure. The sentencing hearing took place over four days and involved multiple witnesses.

On February 13, 2003, the district court sentenced Amedeo to 216 months of imprisonment and eight years of supervised release. It based this sentence on an offense level of 37 and a criminal history category of I. The court increased the sentence based on the abuse of trust and vulnerable victim grounds raised by the government, and imposed an additional enhancement on the ground that Amedeo obstructed justice by influencing witnesses, concealing evidence, and making false statements, pursuant to § 3C1.1.

Furthermore, the court departed upward on several grounds: (1) that Amedeo committed the offense to facilitate a sexual assault on Rozelle, pursuant to U.S.S.G. § 5K2.9; (2) that Amedeo's offense resulted in death, pursuant to § 5K2.1; (3) that he engaged in extreme conduct by failing to seek medical help for Rozelle and by having unprotected sex despite his illness with hepatitis C, pursuant to § 5K2.8; and (4) that Amedeo distributed drugs to multiple minors, pursuant to § 5K2.0.[4] The district court denied Amedeo's request for a reduction based on acceptance of responsibility pursuant to § 3E1.1(a), citing Amedeo's continued assertions of a consensual sexual relationship.

## II.    DISCUSSION

### A.    Applicable law: standard of review and relevant conduct

This case involves challenges to the length of Amedeo's sentence imposed by the district court, pursuant both to enhancements and upward departures from the Sentencing Guidelines.[5] When appeal is taken from an enhancement, we review de novo the district court's interpretation and application of the sentencing

---

[4]The court noted that, had there been any error in its calculation as to the enhancements or in applying §§ 5K2.0 or 5K2.8, the same offense level could have been reached by altering the extent of the departures under §§ 5K2.1 and 5K2.9.

[5]Adjustments and departures are "distinctly different concepts under the Guidelines. Adjustments are changes to an offense level within the Guidelines. Departures, on the other hand, are sentences imposed outside the Guidelines." United States v. Joetzki, 952 F.2d 1090, 1097 (9th Cir. 1991).

guidelines.  United States v. Lewis, 115 F.3d 1531, 1536 (11th Cir. 1997).

Specifically, "[i]n the context of applying enhancements to specific offense

characteristics, this Court has held that our review is de novo." United States v.

Barakat, 130 F.3d 1448, 1452 (11th Cir. 1997).  The district court's factual

findings related to the imposition of sentencing enhancements, however, are

reviewed only for clear error.  Id.

Our review of the district court's departures from the Guidelines is subject

to a slightly different standard.  In 2003, Congress enacted the Prosecutorial

Remedies and Other Tools to end the Exploitation of Children Today Act of 2003

(PROTECT Act).  Pub. L. No. 108-21, § 1, 117 Stat. 650 (2003).  The PROTECT

Act altered the standard of review applied to most challenges to sentencing

departures.  18 U.S.C. § 3742.  Under the Act, we review de novo the district

court's application of the Guidelines to facts in deciding whether a departure was

based on a factor that: (1) advanced the objectives of federal sentencing policy; (2)

was authorized under 18 U.S.C. § 3553(b) (detailing factors to be considered at

sentencing); and (3) was justified by the facts of the case.  18 U.S.C.A. § 3742(e);

United States v. Pressley, 345 F.3d 1205, 1209 n.1 (11th Cir. 2003).  Otherwise,

we give "due deference" to the district court's application of the guidelines to the

facts.  18 U.S.C.A. § 3742(e).  We also give "due regard to the opportunity of the

11

district court to judge the credibility of the witnesses," and we accept the court's findings of fact unless they are clearly erroneous. Id.

We next address the district court's upward departures from the Guidelines range. Before departing from the Guidelines, a district court must determine that an aggravating factor exists that places the case outside of the Guidelines' heartland. United States v. Melvin, 187 F.3d 1316, 1320 (11th Cir. 1999) (citing Koon v. United States, 518 U.S. 81, 98 (1996)). Whether a case is sufficiently unusual to fall outside of the heartland is determined largely by comparison with other Guidelines cases. Id. "Because the district courts see so many Guidelines cases, district courts have an institutional advantage over appellate courts in determining whether a case is outside the heartland, and thus their decisions are entitled to substantial deference." Id.

A court may depart on the basis of a factor enumerated in the Guidelines unless the Guidelines already take the factor into account. Koon, 518 U.S. at 96. If a factor is already taken into account by the applicable guideline, the court may depart only if the factor is "present to an exceptional degree or in some other way makes the case distinguishable from an ordinary case where the factor is present." Id.

In this case, adjudicating the upward departures depends heavily on determining which of Amedeo's conduct properly should be considered for sentencing purposes. The district court was faced with the difficult task of delineating the relevant conduct pursuant to U.S.S.G. § 1B1.3. That section provides, in relevant part, that adjustments shall be determined on the basis of:

> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant;
>
> * * * *
>
> (2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;[6] (3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions . . .

We review the district court's application of § 1B1.3(a) to the facts for clear error. United States v. White, 335 F.3d 1314, 1319 (11th Cir. 2003).

Here, the district court found that the events depicted on the videotape in early November, the events around Rozelle's death in January, and the acts that took place "in between" all constituted a single "common scheme or plan," and thus were relevant conduct within the meaning of § 1B1.3. These acts, it stated,

---

[6]Amedeo's offense of conviction, 21 U.S.C. § 859, is an offense for which § 3D1.2(d) requires grouping of multiple counts.

were linked by Amedeo's ongoing motive: to provide incapacitating drugs to Rozelle for the purpose of taking sexual advantage of him.

In assessing whether conduct is relevant for purposes of § 1B1.3, we look to the "similarity, regularity, and temporal proximity" between the offense of conviction and the uncharged conduct. United States v. Maxwell, 34 F.3d 1006, 1011 (11th Cir. 1994). "[W]e must consider 'whether there are distinctive similarities between the offense of conviction and the remote conduct that signal that they are part of a single course of conduct rather than isolated, unrelated events that happen only to be similar in kind.'" Id. (quoting United States v. Sykes, 7 F.3d 1331, 1336 (7th Cir. 1993)). The commentary to § 1B1.3 of the Guidelines provides: "[I]n a drug distribution case, quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction."

The Guidelines commentary makes clear, however, that § 1B1.3 is designed to take account of "a pattern of misconduct that cannot readily be broken into discrete, identifiable units that are meaningful for purposes of sentencing." U.S.S.G. § 1B1.3, cmt., background. Thus, "when illegal conduct does exist in 'discrete, identifiable units' apart from the offense of conviction, the Guidelines

14

anticipate a separate charge for such conduct." Maxwell, 34 F.3d at 1011 n.32

(quoting United States v. Hahn, 960 F.2d 903, 909 (9th Cir. 1992)) (internal

quotation marks omitted). Other circuits have noted that a preference for separate

charges facilitates a more uniform application of the Guidelines and minimizes

constitutional concerns. See, e.g., Hahn, 960 F.2d at 909; United States v. Wood,

924 F.2d 399, 404 (1st Cir. 1991) ("The goal of the provision, we think, is for the

sentence to reflect accurately the seriousness of the crime charged, but not to

impose a penalty for the charged crime based on unrelated criminal activity.").

We begin with considering the occasions on which Amedeo provided illegal

drugs to Rozelle. See Maxwell, 34 F.3d at 1011 (in conviction for conspiracy to

distribute dilaudid, provision of different drugs to different individuals was not

relevant conduct); United States v. Lawrence, 915 F.2d 402, 408 (8th Cir. 1990)

(finding defendant's cocaine and marijuana sales were part of same course of

conduct where defendant had at least one common customer for both types of

drugs); United States v. Santiago, 906 F.2d 867, 872-73 (2d Cir. 1990) (same

course of conduct found where defendant sold drugs to same purchaser). First,

Costanzo testified that he observed Rozelle and Amedeo smoke marijuana

together on a half-dozen or fewer occasions. He stated that it appeared that

Amedeo had provided the marijuana on some occasions, and that Rozelle also had

15

brought marijuana "a couple of times." Costanzo further testified that he saw Rozelle and Amedeo consume cocaine together once or twice, but that he did not know who supplied it.

Costanzo's friend Wilson also observed Amedeo and Rozelle use marijuana together; on both occasions, Rozelle provided the marijuana. Wilson did not witness any cocaine use on Rozelle's part.

Several other witnesses, high school and college friends of Rozelle, said they participated in or observed shared marijuana use that included Rozelle and Amedeo. This drug use took place in the summer and fall of 2001. The testimony collectively indicated that both Rozelle and Amedeo, at different times, provided the marijuana. These friends did not have knowledge of Amedeo providing Rozelle with cocaine. Their testimony also established that Rozelle extensively used marijuana, cocaine, Xanax, and other pills in high school, before he met Amedeo, and in the college dormitory outside of Amedeo's presence.

Rozelle's college roommate testified that Rozelle stayed at Amedeo's apartment on weekends and often returned with marijuana and occasionally pills. Another college friend testified that Rozelle had a couple of different sources for pills, including Amedeo.

16

Megan Stepanek, Rozelle's girlfriend, testified that in late October she smoked marijuana at Amedeo's apartment with Amedeo and Rozelle, and that both men had supplied some of the drug. She also stated that Rozelle had given her an Ativan pill that he said was Amedeo's, and that it made her lose her memory and feel tired. Stepanek testified that Rozelle told her that sometimes he and Amedeo used cocaine and ecstasy together. Moreover, on one occasion she saw Amedeo give Rozelle money to buy marijuana.

Rozelle's mother testified that she suspected that Rozelle was "high" when he and Amedeo visited her on Thanksgiving, and that she told her ex-husband of her concerns. No specific drugs were referenced. One friend testified that he had heard that Rozelle used cocaine around Thanksgiving, but did not link this use to Amedeo.

Taking into account the applicable case law and the district court's findings, we conclude that here, the relevant conduct is limited to those occasions on which Amedeo provided pills and cocaine to Rozelle for the purpose of taking sexual advantage of him.[7] The district court found that circumstantial evidence supporting this scheme included the testimony by one friend of Rozelle that

---

[7]Whether the evidence established that Amedeo indeed did so is a question we address in sections II(F-H), infra.

17

Rozelle had said that at unspecified times, Amedeo had given him unspecified pills that had "knocked him out." The court also relied on Stepanek's testimony that Rozelle told her that the Ativan he gave her several days earlier, on the weekend of October 26-28, belonged to Amedeo. Thus, the court found, "the evidence establishes that Mr. Amedeo fully understood that the combination of these pills, Ativan, cocaine, ultimately had the effect of simply knocking the recipient out . . .".

This common plan or scheme excludes most of the shared drug use, which involved marijuana. The marijuana use took place with numerous different individuals, and was not uniformly supplied by Amedeo. Rozelle often provided the drug that he, Amedeo, and/or their friends smoked. More to the point, the marijuana was not linked to what the district court deemed the motive behind Amedeo's scheme: to take sexual advantage of Rozelle. The district court did not find, and the record does not indicate, that Amedeo used marijuana to attempt to incapacitate Rozelle.

Moreover, the marijuana distribution originally was charged separately in the indictment in the form of five counts of distribution of marijuana to a minor, 21 U.S.C. § 859; these counts were dismissed as a part of Amedeo's plea bargain. While we do not hold categorically that such separately charged conduct cannot be

18

deemed "relevant conduct" for sentencing purposes under U.S.S.G. § 1B1.3, it does suggest, in these circumstances, that Amedeo's marijuana consumption with minors was sufficiently distinct from the offense of conviction that it warranted a separate charge.  See Maxwell, 34 F.3d at 1011 n.32.

We now turn to the specific adjustments and departures that Amedeo challenges.

B.    Abuse of trust

Amedeo contends that the district court erred in enhancing his sentence two levels for abuse of trust pursuant to U.S.S.G. § 3B1.3.  The court stated that in the event that this enhancement did not hold up on appeal, there was an "alternative backup ground" for increasing the sentence: that the "factual scenario is so extraordinary and unusual that . . . it clearly ought to be a legitimate basis for departure," presumably under U.S.S.G. § 5K2.0.[8]

Section 3B1.3 provides, in relevant part: "If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly

_____

[8]Section 5K2.0 permits upward departures "in the exceptional case in which there is present a circumstance that the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence."  At sentencing, the district court did not specifically cite this provision, but its emphasis on the extraordinary nature of Amedeo's relationship with Rozelle makes clear that § 5K2.0 is the relevant provision.  Moreover, neither party disputes that the district court intended to invoke this Guideline as an alternative holding.

19

facilitated the commission or concealment of the offense, increase by 2 levels."

The application note to this provision states, "For this enhancement to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense." We have interpreted the Guideline's reference to "the offense" to mean the offense of conviction. Barakat, 130 F.3d at 1455.

The district court determined that Amedeo used the "facade" of the attorney-client relationship to conceal his drug use with Rozelle. It held that in light of Rozelle's age and dependence, Rozelle's parents had a relationship of private trust with Amedeo in addition to and apart from the attorney-client relationship between Rozelle and Amedeo.

Amedeo argues that enhancement under this provision was not appropriate because Amedeo's status as Rozelle's lawyer did not facilitate the drug crime depicted on the video. Amedeo was merely one of several friends with whom Rozelle shared drug use. Moreover, he argues, the trust at issue here was limited to his attorney-client relationship with Rozelle. That relationship was not breached, he contends, because he capably represented Rozelle in the proceedings for which he had been retained.

This case does not bear easy application of the examples provided in the commentary to the Guidelines.  <u>See</u> U.S.S.G. § 3B1.3 n.1.  Amedeo's relationship with Rozelle and his parents was qualitatively different, though certainly no less troubling, than that of an attorney serving as guardian who embezzles his client's funds.  <u>See</u> <u>id.</u>

We need not decide this issue, however.  Amedeo posed no timely challenge to the district court's alternative finding, that Amedeo's conduct removed this situation from the heartland of cases involving drug distribution to a minor.  <u>See</u> U.S.S.G. § 5K2.0.  Accordingly, that argument is waived.  <u>Tallahassee Mem'l Reg'l Med. Ctr. v. Bowen</u>, 815 F.2d 1435, 1446 n. 16 (11th Cir. 1987).[9]  We agree that the circumstances of Amedeo's relationship with Rozelle and his family are far removed from the typical drug distributer-customer profile.  Extraordinary facts include Amedeo's participation in and concealment of the same type of criminal conduct for which he was retained to defend Rozelle; his intertwined professional and social relationships with Rozelle and Rozelle's parents; and, not least, the repeated misrepresentations to Rozelle's parents concerning Rozelle's

---

[9]Amedeo does contest this point in his reply brief, to no avail.  <u>See</u> <u>Tallahassee Mem'l Reg'l Med. Ctr.</u>, 815 F.2d at 1446 n. 16 ("[A] party cannot argue an issue in its reply brief that was not preserved in its initial brief.").

(and his own) substance abuse. We see no reason to disturb the district court's alternative ruling, and we affirm the enhancement pursuant to § 5K2.0.

C.    Vulnerable victim

The district court applied a two-level enhancement to Amedeo's sentence on the ground that he knew or should have known that Rozelle was a vulnerable victim, pursuant to U.S.S.G. § 3A1.1(b)(1). It found that Rozelle was predisposed to accept incapacitating drugs, that Amedeo knew of this weakness, and that Amedeo gave him such drugs to render him physically vulnerable to a nonconsensual sexual encounter.

The district court's application of § 3A1.1 presents a mixed question of law and fact, which we review de novo. United States v. Arguedas, 86 F.3d 1054, 1057 (11th Cir. 1996). "The district court's determination of a victim's 'vulnerability' is, however, essentially a factual finding to which we give due deference." Id.

The commentary to § 3A1.1(b) provides that that subsection applies to "offenses involving an unusually vulnerable victim in which the defendant knows or should have known of the victim's unusual vulnerability." It cites the examples of a fraud case in which the defendant marketed an ineffective cancer cure or a

22

robbery case in which the defendant selected a disabled victim. U.S.S.G. § 3A1.1(b) cmt. n.2.

Applying due deference to the court's initial finding of Rozelle's vulnerability, we agree that there was sufficient evidence to support the conclusion that Rozelle's drug addiction rendered him unusually vulnerable to Amedeo's supplying him cocaine. Cf. United States v. Evans, 272 F.3d 1069, 1095 (8th Cir. 2001) (applying § 3A1.1 where defendant encouraged and contributed to drug addiction in Mann Act case); United States v. Bragg, 207 F.3d 394, 399 (7th Cir. 2000) (applying § 3A1.1 where defendant employer fraudulently recruited victims from homeless shelter, where possibly they were seeking help with their drug problems).[10] Amedeo, by virtue of his representation of Rozelle in the drug-related legal matters and his conversation with Rozelle's therapist (who informed Amedeo that Rozelle had a "serious problem"), certainly was aware of this

---

[10]We do not suggest that every drug addict is a vulnerable victim within the meaning of § 3A1.1. See United States v. Pavao, 948 F.2d 74, 78 (1st Cir. 1991), and cases cited. Applying this enhancement is highly fact-specific and must take into account the totality of the circumstances. United States v. Frank, 247 F.3d 1257, 1260 (11th Cir. 2001). In this case, the unusual and disturbing nature of Amedeo's relationship with Rozelle – encompassing both legal representation on drug charges and illegal drug use – removes this case from the ordinary. Cf. Pavao, 948 F.2d at 78-79 ("individual facts about [the victim] . . . combined with those of the crime" supported vulnerable victim finding).

predisposition.[11]  Accordingly, we affirm this sentence enhancement, albeit on

somewhat different grounds than the district court.

D.     Obstruction of Justice

Next, Amedeo challenges the district court's imposition of a two-level

upward adjustment for obstruction of justice pursuant to U.S.S.G. § 3C1.1.  We

recently explained the different levels of deference accorded a district court's

application of this enhancement.  United States v. Banks, 347 F.3d 1266, 1268-69

(11th Cir. 2003) (citing United States v. Williams, 340 F.3d 1231, 1240-41 (11th

Cir. 2003)).  Where the district court must make a particularized assessment of the

credibility or demeanor of the defendant, we accord special deference to the

district court's credibility determinations, and we review for clear error.  Id. at

1269, and cases cited.  "Conversely, where the defendant's credibility or demeanor

is not at issue, and the defendant's conduct can be clearly set forth in detailed,

non-conclusory findings, we review de novo the district court's application of the

enhancement."  Id.  The latter standard of review applies to this case.

---

[11]For the reasons discussed in section II(F), infra, we do not base our holding on the district court's determination that Amedeo deliberately rendered Rozelle vulnerable to sexual assault by administering drugs.  The sentencing enhancement pursuant to  § 3A1.1 can be affirmed solely on the basis of the district court's other findings.

Section 3C1.1 provides, in relevant part, that an upward adjustment of two levels is appropriate where the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction. U.S.S.G. § 3C1.1. The obstructive conduct must relate to (i) the defendant's offense of conviction and any relevant conduct or (ii) a closely related offense. Id. Potentially relevant examples of obstructive conduct include:

(a) threatening, intimidating, or otherwise unlawfully influencing a . . . witness . . . directly or indirectly, or attempting to do so;

\* \* \* \*

(d) destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so;

\* \* \* \*

(g) providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense. . . .

Id. at cmt. 4.

The district court found that after Amedeo understood that Rozelle had died, he "set into motion a well thought out plan to obstruct justice in this case." In its findings, it pointed to the following pieces of evidence: First, Amedeo misinformed the police that he was in a romantic relationship with Rozelle, and he

25

requested that Costanzo lie to support this claim if interviewed by the police.

Second, when Costanzo, Wilson, and Amedeo returned to Amedeo's apartment, they "sanitized" it by washing cocaine from the counter, removing trash, and hiding drug paraphernalia. Third, Amedeo lied, and asked Costanzo to lie, about Costanzo's presence in the apartment. Fourth, Amedeo lied to the police about whether the trash had been collected and thrown away. The district court also found that the effort to obstruct justice continued through the sentencing hearing, in that Amedeo stuck to his story about being in a consensual sexual relationship with Rozelle in order to "cover up and negate" the seriousness of the crime.[12]

As an initial matter, we consider whether any of the incidents described supra are of the nature of obstruction of justice as set forth in § 3C1.1. At a minimum, it appears that Amedeo's urging Costanzo to lie about his presence in the apartment and misrepresent his relationship with Rozelle to the police could be

---

[12]Later in the sentencing hearing, the district court appeared to focus solely on Amedeo's misrepresentations to Officer Sinnott. See U.S.S.G. § 3C1.1, cmt. 4(g). We are skeptical that these statements suffice to ground the enhancement in light of the requirement that a district court must explain how a misrepresentation significantly obstructed or impeded the investigation or prosecution of the offense. United States v. Uscinski, --- F.3d ----, (NO. 03-11377), 2004 WL 1066605, at *2 (11th Cir. May 12, 2004). Although here the district court expressly found that Amedeo's misrepresentations "did, in fact, obstruct the investigation," it did not explain how they did so. Nor is the obstruction apparent from the record. See id. Accordingly, we decline to base Amedeo's enhancement on his misrepresentations to Sinnott. We may affirm the enhancement on other grounds revealed by the record, however. See Powers v. United States, 996 F.2d 1121, 1123-24 (11th Cir. 1993).

deemed an unlawful attempt to "unlawfully influenc[e]" a witness within the meaning of § 3C1.1, cmt. 4(a).[13] While the Guidelines commentary does not define "unlawful influence," our cases have applied this provision under reasonably comparable circumstances. See, e.g., United States v. Rudisill, 187 F.3d 1260, 1263-64 (11th Cir. 1999) (defendant encouraged co-defendant and potential witness to flee from law enforcement authorities); United States v. Garcia, 13 F.3d 1464, 1471 (11th Cir. 1994) (defendant asked witness not to speak with FBI).

Amedeo contends that the conduct that the district court deemed obstructive took place after Rozelle's death and before the videotape was discovered. He contends that there is no evidence that he obstructed the investigation of the instant offense of conviction, i.e. the distribution of the line of cocaine to Rozelle, because that investigation did not begin until after the discovery of the videotape several days later. In other words, he contends that the investigation into Rozelle's death should be treated as distinct from the investigation of drug use that ensued after the videotape was discovered and that led to his conviction.[14]

---

[13]Accordingly, we need not reach the question of whether the other conduct referenced by the district court constituted obstruction of justice.

[14]The court explicitly declined to take a position on the question of whether application of § 3C1.1 is appropriate where the defendant's acts of obstruction take place at a time that precedes an official investigation, but "[w]hen a defendant understands that a police investigation is about to

The factual record does not pinpoint the timing of Amedeo's relevant statements to Costanzo, other than that they occurred after January 6. Even if these statements did precede the discovery of the videotape, we think that under the factual circumstances presented here, the distinction between investigations is artificial and inapt. Apposite cases from other circuits demonstrate that conduct occurring before a formal investigation into the offense of conviction may support a § 3C1.1 enhancement if it foreseeably relates to that offense. In United States v. Norman, 129 F.3d 1393 (10th Cir. 1997), the defendant caused a car accident, and while awaiting the police, attempted to conceal drugs. Id. at 1396. Eventually he was convicted of drug and firearms offenses, and argued against the application of § 3C1.1 on the ground that "the only investigation he anticipated was an unrelated investigation of the car accident." Id. at 1399. The court disagreed, holding that a car accident investigation routinely involves inquiries into whether either driver was "under the influence" and assessment of cars' locations and conditions, as well as possible inventorying of cars' contents. Id. It concluded that the defendant's actions were "sufficiently related to the offense for which he was ultimately convicted." Id.

---

be implemented."

28

The Eighth Circuit upheld a § 3C1.1 adjustment under similar circumstances. United States v. Dortch, 923 F.2d 629 (8th Cir. 1991). In Dortch, the defendant threw cocaine out of the passenger window after being stopped for a traffic offense. Id. at 631. The court rejected his argument that the offense under investigation at the time of his conduct was merely a traffic violation, not a drug offense, noting that "[t]he offense of conviction may or may not be the offense which initially attracted the attention of the police." Id. at 632, and cases cited. See also United States v. Gacnik, 50 F.3d 848, 852 (10th Cir. 1995) (criticizing Dortch holding as too broad, but acknowledging that § 3C1.1 enhancement is appropriate where conduct relied upon to support enhancement relates to crime of conviction).

Similarly, the initial matter investigated related directly and foreseeably to the offense of conviction in this case. Detective Sinnott searched Amedeo's apartment and interviewed him in the context of investigating the cause of Rozelle's death. It was reasonably foreseeable that such an investigation would encompass illegal drug use, especially because Sinnott almost immediately discovered evidence of drugs and drug paraphernalia in the apartment. Moreover, given that Rozelle died in Amedeo's apartment, it is logical that the investigation into the death would encompass the relationship between the two men and the

29

presence of any other potential witnesses.  Surely someone with Amedeo's experience as a criminal defense attorney would foresee the scope of the investigation into Rozelle's death.   Indeed, Amedeo's instructions to Costanzo indicate that Amedeo anticipated the very direction of the investigation. Accordingly, we conclude that the enhancement pursuant to § 3C1.1 was proper.

E.      Acceptance of Responsibility

Next, Amedeo contends that the district court erroneously deprived him of a three-level downward adjustment for acceptance of responsibility. U.S.S.G. § 3E1.1(a) provides: "If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels."   Moreover, the offense level may be decreased by an additional level

> if the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently . . .

Id. at § 3B1.1(b).

We review the district court's determination of acceptance of responsibility only for clear error.  United States v. Dodd, 111 F.3d 867, 870 (11th Cir. 1997).

"A district court's determination that a defendant is not entitled to acceptance of responsibility will not be set aside unless the facts in the record clearly establish that a defendant has accepted personal responsibility." United States v. Sawyer, 180 F.3d 1319, 1323 (11th Cir. 1999).

The Guidelines provide, "Conduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." U.S.S.G. § 3E1.1, cmt. n.4; see also Arguedas, 86 F.3d at 1059-60 (adjustment for acceptance of responsibility not appropriate where defendant repeatedly made materially false statements to authorities and district court, resulting in enhancement for obstruction of justice). In light of our affirmance of the enhancement for obstruction of justice, Amedeo would be entitled to an acceptance of responsibility adjustment only if this were an extraordinary case. Id. at § 3C1.1, cmt. n.4.

The district court explicitly found that this case was not exceptional as compared to other cases involving obstruction of justice, and denied Amedeo's motion for a downward adjustment. It noted that the misrepresentations concerning Amedeo's relationship with Rozelle were "thoughtfully conceived and

. . . purposefully implemented, so much so that I find it has continued right up until the time of sentencing."

In light of these findings and our standard of review, we find no basis for upsetting the district court's decision on this point. We affirm the denial of a downward adjustment pursuant to U.S.S.G. § 3E1.1(a).

F.    Facilitating commission of another offense

The first basis on which the district court upwardly departed was the fact that the offense of conviction was committed to facilitate a sexual assault on Rozelle, pursuant to U.S.S.G § 5K2.9. That section provides, "If the defendant committed the offense in order to facilitate or conceal the commission of another offense, the court may increase the sentence above the guideline range to reflect the actual seriousness of the defendant's conduct." Amedeo contests the court's ten-level upward departure.

The district court found that Amedeo gave Rozelle Ativan in combination with cocaine in order to "knock [him] out" so as to "achiev[e] the end goal of having a nonconsensual sexual encounter," and that this happened at least twice: on the date of the offense of conviction, and several weeks later at the time of Rozelle's death.[15] More specifically, the court found that the offense of

---

[15]As discussed infra, the court based its departure solely on the November events.

32

conviction, on November 11, 2001, "was, in fact, committed for the purpose of facilitating . . . a crime of sexual assault . . . I am prepared to make this finding beyond a reasonable doubt, and I do so because this is reflected on the tape that is in evidence, and there is no question as to what is shown on that tape."

We affirm the court's finding that the sexual encounter depicted on the videotape was not consensual. Rozelle appears to be unconscious, and Amedeo's conduct during that video segment indicates an intention to keep Rozelle unaware of the sexual activity. Even if, as Amedeo insists, he and Rozelle had a romantic relationship, this does not preclude an unlawful assault if one party was unconscious and unable to consent. Accordingly, we affirm the finding that Amedeo sexually assaulted Rozelle in the videotaped encounter.

The district court clearly erred, however, in concluding that the offense of conviction was committed to facilitate the sexual assault. This conclusion rests heavily on the district court's finding that the second and third segments of the videotape – that is, the oral sex and the marijuana and cocaine use – occurred on the same evening. This finding does not appear to be supported by the evidence. First, in the segment depicting the sexual assault, Amedeo and Rozelle are wearing different clothes than in the segment depicting the drug use, indicating that these events took place at different times. In the sexual assault segment, Rozelle and

33

Amedeo are wearing jeans. In the drug-use segment, Rozelle is wearing shorts and a T-shirt, and Amedeo is wearing shorts and a tank top. If, as the district court found, Amedeo gave Rozelle drugs in order to "knock him out," it seems highly implausible that Rozelle would have changed his clothes – or that Amedeo would have put him, while unconscious, into different clothes – prior to the assault.

Second, nothing on the videotape itself, i.e. a counter or a time/date stamp, establishes or even suggests the temporal proximity that the court found as fact. The date of the offense of conviction, November 11, 2001, was established by Amedeo's verbal remarks during the drug-use segment. There is no verbal or other indication of the time or date of the preceding segment.

Indeed, the sequence of the videotape segments indicates that the sexual encounter occurred <u>before</u> the cocaine use that underlies the conviction. Moreover, there was no evidence that any Ativan, Xanax or other pills were used at the time of the videotaped encounter, much less that Amedeo gave them to Rozelle to facilitate the sexual assault.

In evaluating this evidence, as the government urges, we take into consideration the events of January 5-6. The January evidence as to Amedeo's sexual contact with an unconscious Rozelle, coupled with his statements to his friends before and after Rozelle's death, supports the finding that Amedeo sexually

34

assaulted Rozelle in November.  It does not, however, overcome the lack of evidence tying the November sexual assault to the provision of pills and cocaine.

The district court held as a matter of law that a § 5K2.9 upward departure can be premised only on the offense of conviction, not on relevant conduct.  Thus, its departure pursuant to this section was based solely on its findings that the cocaine distribution depicted on the videotape occurring on or about November 11 was to facilitate the sexual assault also shown on the videotape.   The government contends that relevant conduct also may be the basis for application of § 5K2.9.  Accordingly, it argues, we alternatively could sustain the upward departure on the district court's findings that Amedeo used cocaine and Ativan to render Rozelle unconscious so as to sexually assault him on January 5-6.

Whether a departure under § 5K2.1 can be premised on relevant conduct is a legal question for which we have little guidance.  We need not resolve it, however, because our conclusion that there was insufficient evidence to find that Amedeo used cocaine and Ativan to sexually assault Rozelle in November precludes a "common plan or scheme" that would encompass the January events.  Without an anchor to the offense of conviction, the government is left only with distinct, unrelated conduct for which separate charges should have been brought.  Accordingly, we do not consider Amedeo's conduct on January 5-6 -- even if did

35

involve distributing cocaine and Ativan for the purpose of committing another offense -- to be relevant within the meaning of U.S.S.G. § 1B1.3.

G.    Resulting death

Amedeo also argues that the district court erred in applying a four-level upward departure on the ground that the offense of conviction resulted in death pursuant to U.S.S.G. § 5K2.1.  That section provides, "If death resulted, the court may increase the sentence above the authorized guideline range."[16]  It goes on to explain, in relevant part:

> Loss of life does not automatically suggest a sentence at or near the statutory maximum. The sentencing judge must give consideration to matters that would normally distinguish among levels of homicide, such as the defendant's state of mind and the degree of planning or preparation.  Other appropriate factors are whether multiple deaths resulted, and the means by which life was taken.  The extent of the increase should depend on the dangerousness of the defendant's conduct, the extent to which death or serious injury was intended or knowingly risked, and the extent to which the offense level for the offense of conviction, as determined by the other Chapter Two guidelines, already reflects the risk of personal injury.

U.S.S.G. § 5K2.1.

---

[16]At oral argument, the government alternatively contended that even if section 5K2.1 does not apply, Rozelle's death was "resulting harm" and hence should be taken into account for sentencing purposes under the relevant conduct provisions. See § 1B1.3(a)(1)(3)(sentencing shall include consideration of "all harm that resulted from" relevant conduct).  This argument was not set forth in the government's brief, and hence is not preserved.   See Flanigan's Enterprises, Inc. of Georgia v. Fulton County, 242 F.3d 976, 987 n.16 (11th Cir. 2001).  In any event, our holding as to the limitations on relevant conduct in this case precludes the government's position.

Rozelle's death in January did not directly result, of course, from the conduct involved in the offense of conviction, which took place two full months earlier. The district court swept Rozelle's death into the ambit of Amedeo's sentence by invoking the relevant conduct provisions at U.S.S.G. § 1B1.3(2). See United States v. Purchess, 107 F.3d 1261, 1271 (7th Cir. 1997) ("an upward departure under section 5K2.1 may be based on harm resulting from relevant conduct as opposed to conduct comprising the offense of conviction"), and cases cited. The court found that Amedeo supplied Ativan and cocaine to Rozelle that "contributed substantially" to Rozelle's death on January 5-6. Hence, it concluded that death resulted from Amedeo's relevant conduct, which was the common scheme or plan to provide pills and cocaine to take sexual advantage of Rozelle.

For the reasons discussed supra, section II(F), we cannot affirm the conclusion that Rozelle's conduct on January 5-6 involved a "same course of conduct or common scheme or plan as the offense of conviction." Accordingly, the relevant conduct doctrine does not permit Amedeo's sentence to encompass the events of January 5-6. We do not suggest that Amedeo could not be criminally liable had he faced separate charges in connection with Rozelle's death. We simply hold that Amedeo's offense of conviction did not encompass Rozelle's death for sentencing purposes.

H.    Upward departure under § 5K2.0: multiple minors

Pursuant to U.S.S.G. § 5K2.0, a district court may upwardly depart if the case is atypical. Such departures are "reserved for 'unusual' cases where there is something atypical about the defendant or the circumstances surrounding the commission of the crime which significantly differ from the normal or 'heartland' conduct in the commission of the crime." United States v. Gonzalez-Lopez, 911 F.2d 542, 549 (11th Cir. 1990) (quoting United States v. Williams, 891 F.2d 962, 964 (1st Cir. 1989)).

The district court departed on the ground that Amedeo had engaged in drug use with multiple minors. Specifically, it found: "In addition to making his home available to Mr. Rozelle, Mr. Amedeo made his home available to other young adults, that is people between the age of 18 and 21, to whom he distributed drugs, illegal drugs." It then concluded that a two-level departure was justified based on "the number of people involved, the age of the people, the timing, the ready accessibility of the drugs and so on."

Here, we begin our analysis by examining § 2D1.2, the guideline applicable to Amedeo's offense of conviction, 21 U.S.C. § 859. The base offense level is determined by the quantity of drugs distributed; it is enhanced if the drug was distributed to an underaged person. It does not, however, take into consideration

38

the number of underaged victims. Accordingly, the relevant guideline does not take into account at least some of the circumstances upon which the district court based its conclusion.[17]

For the reasons explained supra, we hold that the marijuana smoking with minors other than Rozelle was not relevant conduct and thus should not be incorporated into Amedeo's sentence. None of the minors at issue here consumed cocaine, the drug that formed the offense of conviction. As discussed supra, the characteristics of the marijuana use with Rozelle's friends differed materially from the cocaine use that Rozelle and Amedeo engaged in, and it appears that it was the basis for a separate count in the indictment.

I.      Upward departure under § 5K2.8: extreme conduct

Amedeo also contests the district court's one-level upward departure for "extreme conduct," in this case Amedeo's unprotected sexual contact with Rozelle during his treatment for hepatitis C.[18]

---

[17]Even if a factor, such as age, is already taken into account by the applicable guideline, the court still may depart if the factor is "present to an exceptional degree or in some other way makes the case distinguishable from an ordinary case where the factor is present." Koon, 518 U.S. at 96. The district court did not make specific findings or otherwise indicate it was enhancing Amedeo's sentence on this basis, however. It simply stated, "I find in this case that the distribution of drugs to people under the age of 21 is not a factor considered by the guidelines."

[18]At sentencing, the district court also applied § 5K2.8 based on Amedeo's failure to call emergency services after Rozelle was unconscious. Amedeo does not appeal from this departure.

Section 5K2.8 allows upward departure "[i]f the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim." We have affirmed use of this enhancement where an HIV-infected adult defendant engaged in numerous sex acts with a fifteen-year-old. United States v. Blas, 360 F.3d 1268, 1273-74 (11th Cir. 2004) (affirming departure on the basis of both §§ 5K2.8 and 5K2.0).

In this case, however, we have held that Amedeo's sexual encounters with Rozelle on January 5-6 are beyond the relevant scope of conduct for sentencing purposes. Hence, the enhancement cannot apply.

One final note: At sentencing, the district court stated that even if it erred in its calculations as to any of the enhancements or the departures pursuant to §§ 5K2.0 or 5K2.8, the same offense level could have been reached by applying departures under §§ 5K2.1 and 5K2.9. Since we vacate the upward departures that were applied pursuant to §§ 5K2.1 and 5K2.9, those provisions cannot provide an alternative basis for the sentence. The district court therefore must recalculate the sentence in accord with this opinion.

III.   CONCLUSION

This is a difficult case, both in its legal complexity and its tragic factual setting. It is clear the district court conducted the sentencing proceedings with the

40

utmost care and sensitivity to the parties, and grappled rigorously and conscientiously with the challenging issues presented.  Our opinion today vacates the upward departures premised on the defendant's conduct that fell beyond the appropriate scope of sentencing, but is not intended to condone or minimize that conduct.

AFFIRMED in part, VACATED in part, and REMANDED for further proceedings consistent with this opinion.