[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-10289
Non-Argument Calendar

_____

D.C. Docket No. 8:17-cr-00507-JDW-AEP-8

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

PRINCE GRANT,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(February 19, 2020)

Before JILL PRYOR, NEWSOM and ANDERSON, Circuit Judges.

PER CURIAM:

Prince Grant appeals his sentence of 120 months' imprisonment imposed after he pled guilty to one count of conspiracy to distribute heroin and furanyl fentanyl, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C). On appeal, Grant argues that the district court erred in departing upward under U.S.S.G. § 5K2.1 from his Sentencing Guidelines range. The district court departed upward after finding that a victim had died as a result of Grant's relevant conduct and participation in the drug-distribution conspiracy. After careful review, we affirm.

## I.    BACKGROUND

A grand jury charged Grant and 10 co-defendants in a multi-count indictment alleging a conspiracy to distribute and possess with intent to distribute heroin, fentanyl, and fentanyl analogues, specifically furanyl fentanyl.[1] Count I charged Grant with participation in the conspiracy, in violation of 21 U.S.C. § 846; Counts II and III charged him with possession with the intent to distribute these controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 18 U.S.C § 2. Grant pled guilty to Count I pursuant to a plea agreement, in exchange for the government's agreement to dismiss Counts II and III.

### A. Factual Background

---

[1] There are different spellings of furanyl fentanyl in the record, but we will refer to it as "furanyl fentanyl," as the parties do.

2

A probation officer prepared a presentence investigation report ("PSR") for Grant.[2]  The PSR stated that Grant's co-defendants operated a drug- trafficking organization, which distributed heroin, fentanyl, and fentanyl analogues.  The co-defendants combined and packaged these substances into bindle quantities—a bindle usually refers to .10 grams of heroin—and then distributed the bindles to dealers in Lakeland, Florida.  Grant was one of these dealers.

Lakeland Police Department ("LPD") officers, responding to an emergency call for assistance, discovered D.K. lying face up on the floor and unresponsive. Next to D.K.'s body was a syringe, a spoon, and three bindles of heroin, one of which was open.  The bindles were stamped with a blue/green skull and the words "Kill Bill."  Doc. 356 at ℙ 30.[3]  D.K. was later pronounced dead at the hospital. According to the toxicologist's analysis, multiple substances in D.K.'s system caused her death.  Although other facts surrounding D.K.'s death suggested that she had died of an opioid overdose, the toxicological analysis showed the presence of additional controlled substances.

LPD began an investigation and discovered, after searching D.K.'s cellphone, several text messages she sent to Grant two and a half hours before the

---

[2]  Neither party objected to the following facts set forth in the PSR.

[3]  "Doc. #" refers to the numbered entry on the district court's docket.

police found her unresponsive.  The text messages said, "On my way want astamp[4] for my mailfeel me,"  "Hope u r there,"  "I am here,"  "Boo please give me a eta," and then "Ru coming or should I leave."  Doc. 356 at ¶ 31.  The police uncovered Grant's palm print on one of the bindles found next to D.K.'s body.

LPD learned that Grant was a local drug dealer who distributed narcotics out of an apartment in Lakeland, Florida.  They executed a search warrant at the apartment, where Grant was apprehended after attempting to flee out of a window.  In the apartment, LPD found 20 bindles of heroin that contained the same "Kill Bill" stamp as the bindles discovered near D.K.'s body.  An analysis of Grant's phone, which was seized during the execution of the search warrant, revealed 15 calls from and two calls to D.K. during the two days leading up to her death.

Two other victims died after purchasing bindles from members of the conspiracy.

Grant pled guilty to Count I, the conspiracy count, and the remaining counts were dismissed.

## B. Sentencing

For sentencing purposes, the probation officer assigned Grant a base offense level of 14.  The PSR applied various enhancements and reductions that resulted in a total offense level of 15.  Given Grant's assigned criminal history category of VI,

---

[4] The PSR identifies "stamp" as a common street term for a package of heroin.

4

his recommended guideline range was 41 to 51 months' imprisonment. The PSR noted that there were several possible bases that would justify an upward departure, one of which was that a death had resulted from the offense conduct. *See* U.S.S.G. § 5K2.1 ("If death resulted, the court may increase the sentence above the authorized guideline range."). The statutory maximum sentence was 360 months' imprisonment. *See* 21 U.S.C. §§ 846, 841(b)(1)(C), 851.

At sentencing, the government recommended an upward departure under U.S.S.G. § 5K2.1 from Grant's guidelines range, explaining that his relevant conduct involved potent substances, fentanyl and fentanyl analogues, which created a severe risk of death. The government also argued that—although it could not prove that Grant's conduct was the but-for cause of D.K.'s death due to multidrug toxicity in her system—there nonetheless was sufficient evidence for the district court to find by a preponderance of the evidence that Grant was responsible for her death. Grant objected to the upward departure and pointed to the government's acknowledgment that it could not establish beyond a reasonable doubt that the drugs Grant distributed were the but-for cause of D.K.'s death. Grant also contended that because D.K. had in her system multiple drugs, including a lethal amount of cocaine, which he had not distributed, there was insufficient evidence to prove under any standard that he had caused her death.

5

Dr. Stephen Nelson, the medical examiner who performed D.K.'s autopsy, testified at sentencing. Nelson testified that the cause of death was multiple drug intoxication. According to Nelson, D.K. suffered from hemorrhagic pulmonary edema, meaning that she had increased fluid in her lungs. Nelson explained that the pulmonary edema was evidenced in part by the increased weight of her lungs at the time of her death. He testified that the increased weight of D.K.'s lungs was consistent with an opioid overdose. The toxicology report revealed cocaine in D.K.'s blood and urine and morphine—which was indicative of heroin use—and furanyl fentanyl in her urine. Nelson could not determine when D.K. had ingested the heroin or furanyl fentanyl, as neither was found in her blood. Nelson concluded that heroin and furanyl fentanyl contributed substantially to D.K.'s death, despite the fact that he could not say that heroin was the but-for cause due to the presence of cocaine in her system as well. Nelson characterized the level of cocaine in D.K.'s system at the time of her death as acute.

Drug Enforcement Agency special agent Andrew Scripture, a lead agent on the investigation into the drug-trafficking conspiracy and the overdoses that resulted, also testified at Grant's sentencing. Scripture testified that LPD took photographs of the crime scene because they suspected that D.K.'s death resulted from an overdose. The government introduced some of these photographs into evidence. The photographs showed bindles of heroin labeled with "Kill Bill"

6

stamps next to D.K.'s body. The photographs also showed an open bindle next to a needle, indicative, according to Scripture, that the heroin from that bindle had been injected with the needle. Scripture further testified that the residue from the bindles found in D.K.'s apartment tested positive for heroin and furanyl fentanyl, just like the bindles found in Grant's apartment.

The district court accepted the government's recommendation to depart upward, concluding that under § 5K2.1 the government had to show by a preponderance of the evidence that D.K.'s death resulted from Grant's relevant conduct. The court found that the government satisfied this standard given the evidence that Grant had distributed the drugs to D.K., she injected them, and they contributed substantially to her death, as evidenced by the morphine found in her urine and her heavy lung weight. In calculating Grant's guideline range, the court applied various enhancements and reductions, which resulted in an adjusted offense level of 11. The court then departed upward to an offense level of 25, resulting in a new guidelines range of 110 to 137 months, and sentenced Grant to 120 months' imprisonment. Grant objected both to the departure and the extent of the departure. Grant now appeals the upward departure.[5]

## II.    STANDARD OF REVIEW

---

[5] Grant appeals only the court's decision to depart upward, not the extent of the departure.

We review the district court's interpretation and application of the Sentencing Guidelines *de novo* and its factual findings for clear error. *United States v. Little*, 864 F.3d 1283, 1290 (11th Cir. 2017). We review the district court's decision to grant an upward departure for an abuse of discretion. *United States v. Flanders*, 752 F.3d 1317, 1341 (11th Cir. 2014).

## III.    DISCUSSION

Grant challenges on appeal the district court's application of U.S.S.G. § 5K2.1 to depart upward from his guidelines range. The district court departed upward after finding that D.K.'s death had resulted from Grant's relevant conduct. Grant argues that the government failed to meet its burden to prove that Grant's conduct contributed substantially to D.K.'s death.[6] Grant argues that because D.K.

---

[6] Grant raises two additional arguments on appeal. He acknowledges that U.S.S.G. § 1B1.3 permits district courts to consider "relevant conduct" in sentencing but argues that this section does not apply to § 5K2.1 unless the conduct is inherent in or an element of the offense of conviction. Specifically, he contends that only "offense conduct"—that is, conduct proven beyond a reasonable doubt— can form the basis of a 5K2.1 departure and that D.K.'s death, which the government admitted could not be proven beyond a reasonable doubt, therefore could not properly be taken into consideration. He alternatively argues that, even if relevant conduct could be considered in granting the upward departure under § 5K2.1, the district court erred by using a "contributed substantially" rather than a but-for standard.

To preserve an issue for appeal, "one must raise an objection that is sufficient to apprise the trial court and the opposing party of the particular grounds upon which appellate relief will later be sought." *United States v. Dennis*, 786 F.2d 1029, 1042 (11th Cir. 1986). An objection must be raised "in such clear and simple language that the trial court may not misunderstand it." *United States v. Straub*, 508 F.3d 1003, 1011 (11th Cir. 2007) (internal quotation marks omitted). Here, Grant raised no objection sufficient to apprise the trial court of these arguments at sentencing. We therefore review them only for plain error.

Even if we assumed for argument's sake that error occurred, the error would not be plain. We have explained that "where the explicit language of a statute or rule does not specifically

8

had additional drugs not distributed by Grant in her system when she died, the evidence was insufficient to prove that Grant's distribution to her of the heroin substantially contributed to her death.  After careful review, we conclude that the district court did not abuse its discretion in determining that the government had met its burden.

Section 5K2.1 provides that "[i]f death resulted, the court may increase the sentence above the authorized guideline range."  U.S.S.G. § 5K2.1.  The guideline instructs the sentencing judge to consider certain factors such as the "defendant's state of mind and the degree of planning or preparation . . . whether multiple deaths resulted, and the means by which life was taken."  *Id.*  Additionally, "[t]he extent of the increase should depend on the dangerousness of the defendant's conduct, the extent to which death or serious injury was intended or knowingly risked, and the

---

resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it."  *United States v. Chau*, 426 F.3d 1318, 1322 (11th Cir. 2005) (internal quotation marks omitted).  Relevant conduct as defined in § 1B1.3 may include both "uncharged and acquitted conduct that is proven at sentencing by a preponderance of the evidence."  *United States v. Siegelman*, 786 F.3d 1322, 1332 (11th Cir. 2015).  Although Grant argues that relevant conduct cannot be taken into consideration under § 5K2.1 unless the conduct was inherent in or an element of the offense of conviction, there is no Supreme Court or Eleventh Circuit case law on this issue and therefore any error cannot be plain.  *See United States v. Amedeo*, 370 F.3d 1305, 1322 (11th Cir. 2004) ("Whether a departure under § 5K2.1 can be premised on relevant conduct is a legal question for which we have little guidance.").  Additionally, Grant has pointed to no Supreme Court or Eleventh Circuit case law establishing a but-for causation standard for an upward departure under § 5K2.1.  Any error by the district court was therefore not plain.  *See Chau*, 426 F.3d at 1322.

extent to which the offense level for the offense of conviction . . . already reflects the risk of personal injury." *Id.*

The government's case at sentencing included the testimony of Nelson, the medical examiner who conducted D.K.'s autopsy. Nelson testified that notwithstanding the presence of cocaine in D.K.'s system, the heroin and furanyl fentanyl had contributed substantially to her death. Specifically, Nelson testified that because heroin metabolizes into morphine, the presence of morphine in D.K.'s urine indicated heroin use. Additionally, Nelson testified that D.K.'s pulmonary edema, demonstrated by heavy lung weight, indicated that she had died of an opioid overdose; pulmonary edema does not occur with cocaine use. The government also presented as a witness agent Scripture, who testified regarding the photographs LPD took at the scene. The photographs showed the bindles bearing "Kill Bill" stamps and containing the heroin and furanyl fentanyl combination near D.K.'s body, including one opened bindle. These bindles matched the bindles found in Grant's apartment that had the same stamp and contained the same drugs—further indicating that before her death D.K. used heroin that she purchased from Grant. The text messages and calls exchanged between Grant and D.K. only a couple of hours before her death corroborated that she obtained the deadly drugs from Grant. This evidence was sufficient to meet the government's burden to

prove by a preponderance of the evidence that D.K.'s death resulted from an overdose of drugs she purchased from Grant.

The district court therefore did not abuse its discretion in upwardly departing under § 5K2.1.

## IV.    CONCLUSION

For the reasons set forth above, we affirm Grant's sentence.

**AFFIRMED**.